1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  JAMES M. HUMES
   Chief Deputy Attorney General
3  JANET GAARD
   Chief Assistant Attorney General
4  KATHLEEN E. FOOTE
   Senior Assistant Attorney General
5  BARBARA M. MOTZ (SBN 66933)
   Supervising Deputy Attorney General
6  CHERYL L. JOHNSON (SBN 66321)
   PATRICIA L. NAGLER (SBN 101150)
7  WINSTON H. CHEN (SBN 166959)
   JONATHAN M. EISENBERG (SBN 184162)
8  Deputy Attorneys General
     300 South Spring St., Ste. 1702
9    Los Angeles, CA 90013
     Telephone: (213) 897-6505
10   Fax: (213) 897-2801
     Email: jonathan.eisenberg@doj.ca.gov
11 Attorneys for Plaintiff
   STATE OF CALIFORNIA

12

13              IN THE UNITED STATES DISTRICT COURT

14          FOR THE CENTRAL DISTRICT OF CALIFORNIA

15                     SOUTHERN DIVISION

16

| | |
|---|---|
| STATE OF CALIFORNIA, ex rel EDMUND G. BROWN JR., | CV 04-0687 AG (SSx) |
| Plaintiff, | PLAINTIFF STATE OF CALIFORNIA'S STATEMENT OF GENUINE ISSUES OF MATERIAL FACT IN OPPOSITION TO RENEWED DEFENSE MOTION FOR SUMMARY JUDGMENT RE: NON-STATUTORY LABOR EXEMPTION TO FEDERAL ANTITRUST LAWS |
| v. | |
| SAFEWAY, INC., dba Vons, a Safeway Co., ALBERTSON'S, INC., RALPHS GROCERY CO., a division of the Kroger Co., FOOD 4 LESS FOOD CO., a division of the Kroger Co., and DOES 1 through 100, inclusive, | |
| Defendants. | Judge: Hon. Andrew J. Guilford |
| | Courtroom: 10D |
| | Hearing Date: March 10, 2008 |
| | Hearing Time: 10:00 a.m. |
| | Trial Date: April 15, 2008 |

1    Pursuant to Local Rule 56-2, plaintiff State of California (the "State")

2  submits the following statement of genuine issues of material fact in opposition to

3  the renewed defense motion for summary judgment, filed herein by defendants

4  Albertson's, Inc. ("Albertson's), Food 4 Less ("F4L"), Ralphs Grocery Co.

5  ("Ralphs"), Safeway Inc. ("Safeway"), and The Vons Cos., Inc. ("Vons";

6  collectively, "Defendants")[1] on January 18, 2008 and January 23, 2008:

7  **I. OBJECTIONS TO ALLEGED DEFENSE UNCONTROVERTED FACTS**

8  **A. ALLEGED DEFENSE UNCONTROVERTED FACT NO. 4:**

9    The MSAA also provided that, in the event of a strike, an Employer who

10  gained disproportionate revenues during the strike would make payments to an

11  Employer who incurred disproportionate losses during the strike.  Id.  The idea

12  behind this revenue sharing provision was to lessen the impact of Union

13  whipsawing by having the targeted Employer's "pain" shared by other members of

14  the group (hence, these agreements are commonly called "pain sharing

15  agreements").  Huston Decl. Ex. 19 (Renda 8/10/07 Dep. 343:17-345:2), Ex. 12

16  (Schroeder Dep. 58:4-59:3), Ex. 27 (Cox 2007 Dep. 16:9-17:4).

17  **THE STATE'S DISPUTE OF ALLEGED FACT NO. 4:**

18    The State disputes asserted uncontroverted fact no. 4 in two respects.  *First*,

19  on March 8, 2004, Albertson's, The Kroger Co. ("Kroger," on behalf of its

20  subsidiaries, F4L and Ralphs), and Safeway told the National Labor Relations

21  Board (the "NLRB") as follows:  "The purpose of the revenue sharing provisions

22  of the MSAA is to maintain the relative pre-strike revenue positions of the parties

23  vis-à-vis one another in order to keep the parties in the same financial position

24  during the strike and, in particular, in the event the Unions attempted to cause the

25  Employers to feel the effects of the strike differently – a tactic the Unions

26  attempted here." (*See* Exh. I (p. 28) to the accompanying Decl. of Jonathan M.

27  

28    1. The Kroger Co. owns both F4L and Ralphs.  Safeway is the parent company
of Vons.

1   Eisenberg in Opp. to Renewed Def. Mtn. for Summ J. Re: NSLE ("Eisenberg
2   Decl.")).  The MSAA can best be understood as Defendant's pact to lay back from
3   competing vigorously with each other during the strike/lock-out.  That
4   understanding fits with the fact that the MSAA's effect on the product market was
5   direct; the effect on the labor negotiations was indirect.  Under the MSAA, Ralphs
6   paid Albertson's and Vons more than $10 million for the month of October 2003,
7   because Ralphs had "extra" sales relative to Albertson's and Vons during that time
8   – a time when the union was picketing all Defendants equally, i.e., there was no
9   whipsawing.  (*See* Exh. 16 to Jul. 17, 2006 Decl. of Thomas R. McCarthy, Ph.D.
10  in Opp. to Plf.'s Mtn. for Summ J. ("McCarthy Decl."), on file herein.)  *Second*,
11  there is no evidence that the MSAA and similar agreements are "commonly"
12  referred to by any particular name.  The reason is that there is no evidence that, at
13  least since the mid nineteenth century, such agreements are common; there is no
14  evidence that the MSAA or similar agreements are used by entities other than
15  Defendants herein and some of Defendants' business competitors in the
16  supermarket industry to whom Defendants have given copies of MSAAs.

17  **B. ALLEGED DEFENSE UNCONTROVERTED FACT NO. 6:**

18        The undisputed and unanimous testimony of numerous deponents confirmed
19  that the purpose of the revenue sharing provision was to counter anticipated Union
20  whipsaw tactics during the collective bargaining process.  Huston Decl. Ex. 15
21  (Collins Dep. 27:17-28:12), Ex. 16 (Thornton Dep. 107:5-108:4), Ex. 17 (Johnston
22  Dep. 98:7-98:20), Ex. 18 (Burd Dep. 26:3-26:17), Ex. 19 (Renda 5/03/07 Dep.
23  140:6-10, 143:7-11, 145:10-146:4, Renda 8/10/07 Dep. 344:3-344:10), Ex. 20
24  (Pankow Dep. 131:4-131:18), Ex. 21 (Terrell 4/25/07 Dep. 22:14-22:22), Ex. 22
25  (Burgon Dep. 54:17-54:23), Ex. 23 (McMullen Dep. 192:19-194:13, 201:17-
26  203:22, 266:10-266:24).

27
28

**THE STATE'S DISPUTE OF ALLEGED FACT NO. 6:**

The State disputes asserted uncontroverted fact no. 6. As noted above, on March 8, 2004, Albertson's, Kroger, and Safeway told the National Labor Relations Board as follows: "The purpose of the revenue sharing provisions of the MSAA is to maintain the relative pre-strike revenue positions of the parties vis-à-vis one another in order to keep the parties in the same financial position during the strike and, in particular, in the event the Unions attempted to cause the Employers to feel the effects of the strike differently – a tactic the Unions attempted here." (*See* Exh. I (p. 28) to Eisenberg Decl.). The MSAA can best be understood as Defendant's pact to lay back from competing vigorously with each other during the strike/lock-out. That understanding fits with the fact that the MSAA's effect on the product market was direct; the effect on the labor negotiations was indirect. Under the MSAA, Ralphs paid Albertson's and Vons more than $10 million for the month of October 2003, because Ralphs had "extra" sales relative to Albertson's and Vons during that time – a time when the union was picketing all Defendants equally, i.e., there was no whipsawing. (*See* Exh. 16 to McCarthy Decl.)

**C. ALLEGED DEFENSE UNCONTROVERTED FACT NO. 7:**

On October 11, 2003, the Unions struck Vons. Huston Decl. Ex. 9 (Cox 2004 Decl. ¶¶ 7), Ex. 11 (Bohn Decl. ¶¶ 9). This selective strike against Vons alone was the beginning of the Unions' whipsaw campaign. The next day, pursuant to the MSAA, Albertson's and Ralphs locked out their UFCW bargaining unit employees. Huston Decl. Ex. 10 (Schroeder Decl. ¶¶ 12), Ex. 11 (Bohn Decl. ¶¶ 9). The Unions at first picketed all the Employers and certain of their warehouses, but by the end of October, three weeks into the strike, the whipsawing became more pronounced. Huston Decl. Ex. 10 (Schroeder Decl. ¶¶ 12). The Unions stopped picketing at most Ralphs stores and encouraged shoppers to patronize Ralphs stores and Food-4-Less stores, which are owned by Ralphs. Cox

1  Decl. Ex. 3; Huston Decl. Ex. 10 (Schroeder Decl. ¶¶ 13).  Picketing of Vons and
2  Albertson's stores continued until the end of the strike in late February 2004.
3  Huston Decl. Ex. 9 (Cox 2004 Decl. ¶¶ 7), Ex. 10 (Schroeder Decl. ¶¶ 15).  Vons
4  and Albertson's faced the loss of customers not only to Ralphs and Food-4-Less,
5  but also to stores not involved in the labor dispute, such as Stater Brothers, Trader
6  Joe's, independent markets, Costco and Wal-Mart.  Huston Decl. Ex. 20 (Pankow
7  Dep. 69:9-69:16).

8  **THE STATE'S DISPUTE OF ALLEGED FACT NO. 7:**

9      The State disputes asserted uncontroverted fact no. 7 to the extent of its
10  claim that the union whipsawing began on October 11, 2003, when the union
11  struck Vons only, not the other defendants.  As shown by Exhibit 2 to the January
12  18, 2008 declaration of Richard D. Cox, Safeway's senior vice president of labor
13  relations (said declaration filed by Defendants herein), no later than October 7,
14  2003 the union was aware that Defendants had a mutual lock-out agreement, under
15  which plan if one Defendant was struck by the union, the other Defendants were
16  obligated to lock out their unionized employees virtually immediately.  Hence the
17  union knew that striking any Defendant would lead to a defense counter-measure,
18  a lock-out, that would equalize the "pain" among Defendants.  There was no intent
19  and no implementation of any whipsawing until the union pulled pickets from
20  Ralphs stores at the very end of October 2003.

21  **D.  ALLEGED DEFENSE UNCONTROVERTED FACT NO. 7:**
22      Ralphs owns over a hundred Food-4-Less stores in Southern California.
23  Huston Decl. Ex. 10 (Schroeder Decl. ¶¶ 4).  While the Food-4-Less agreements
24  were separate, they were directly tied to the collective bargaining agreement
25  between the Employers and the Unions.  Specifically, the cost to Food-4-Less of
26  the benefits accorded to its employees are a direct percentage (75%) of the costs of
27  benefits accorded to the Ralphs Supermarkets employees.  Huston Decl. Ex. 12
28  (Schroeder Dep. 29:1-30:11).  Several additional sections of the Food-4-Less

1  agreements are directly linked to the agreement between the Employers and the

2  Unions.  Huston Decl. Ex. 10.

3  **THE STATE'S DISPUTE OF ALLEGED FACT NO. 7:**

4       The State disputes asserted uncontroverted fact no. 9.  Ralphs does not own

5  F4L; Ralphs and F4L are separate companies (both owned by Kroger), who

6  consider each other competitors, and whose pricing policies and practices are

7  separate.  (*See* Exh. J (p. 33) and Exh. K (pp. 35-36) to Eisenberg Decl.)

8  Furthermore, it is clear from a comparison of Exhibit 5 versus Exhibits 6 and 7 of

9  the January 18, 2008 declaration of Safeway attorney Peter K. Huston, which

10  declaration Defendants submitted with the moving papers, that the collective

11  bargaining agreements governing retail workers at Albertson's, Ralphs, and Vons

12  stores different in numerous substantive respects from the collective bargaining

13  agreements governing retail workers at F4L stores.

14  **E.  ALLEGED DEFENSE UNCONTROVERTED FACT NO. 10:**

15       The Employers had used MSAAs with revenue sharing to support

16  multiemployer and coordinated bargaining in the supermarket industry for many

17  years and the agreements have never before been attacked as violating the antitrust

18  laws.  Huston Decl. Ex. 9 (Cox. 2004 Decl. ¶¶ 8), Ex. 13 (Cox 2004 Dep. 30:18-

19  32:9), Ex. 27 (Cox 2007 Dep. 14:15-16:8, 35:7-37:10).

20  **THE STATE'S DISPUTE OF ALLEGED FACT NO. 10:**

21       The State disputes asserted uncontrovered fact no. 10 as misleading. There

22  is no evidence that Defendants made any revenue-sharing payments to one another

23  under any MSAA other than the MSAA in dispute in the present case and a 1996

24  MSAA used in Denver, CO by Kroger and Safeway (but not Albertson's).  There

25  is no evidence that any entity besides supermarket companies knew about any

26  MSAAs before the existence of the MSAA in the instant case became publicly

27  known in late 2003; because earlier MSAAs had been largely concealed by the

28  supermarket industry, no entity that might have challenged an earlier MSAA under

1 | the antitrust laws could have done so.

2 | **F.  ALLEGED DEFENSE UNCONTROVERTED FACT NO. 10:**

4 |     Affiliates of the Employers entered into an almost identical MSAA in the

5 | Denver area subsequent to the Southern California MSAA. Cox Decl. Ex. 4 (Copy

6 | of Colorado MSAA).  In response to a union challenge involving that MSAA the

7 | Regional Director of Region 27 of the Board stated:

> The [MSAA] is merely a pact to assist each other financially in the event of a Union strike and, therefore, constitutes a defensive economic weapon in response to the Union's own potential use of an economic weapon. The use of various types of economic tactics by parties engaged in labor negotiations has long been held lawful. Even employers bargaining separately, outside a multiemployer unit, may band together in mutual aid pacts in order to enhance their economic tactics.

Cox Decl. Ex. 5 (Decision to Dismiss issued 2/28/05 by the Regional Director of Region 27 of the Board) (emphasis added) (citations omitted)

**THE STATE'S DISPUTE OF ALLEGED FACT NO. 11:**

    The State disputes alleged uncontroverted fact no. 11 to the extent that it implies that the Denver, CO office of the NLRB held that an MSAA did not violate the antitrust laws.  As the NLRB letter shows, the letter's author was expressly addressing a union's narrow claim that the employers had been "engaging in multiemployer bargaining over the Union's objection," by doing multiple things including entering into an MSAA, with no mention or discussion whatsoever of antitrust law.  The letter cannot fairly be called a ruling that MSAAs do not violate the antitrust laws.

**II.  OBJECTIONS TO ALLEGED DEFENSE CONCLUSIONS OF LAW**

    Defendants' statement of uncontroverted facts and conclusions of law contains a two-part recitation of conclusions of law, split into sections "A" and "B."  Although none of these conclusions of law, by definition, represents an asserted uncontroverted fact, the State must register its three-part objection to the entire section "B" of defense-oriented conclusions of law.

*First*, contrary to Defendants' statements of law, and as the U.S. Supreme Court has plainly held, the non-statutory labor exemption to the antitrust laws *"offers no...protection"* to attempts *"to restrain competition in a business market." Connell Constr. Co. v. Plumbers & Steamfitters Local Union No. 100*, 421 U.S. 616, 622-23 (1975) (emphasis added). "The exemption has never been regarded as an open-ended invitation to those involved in a labor dispute to restrain competition in the product market. It is a '*limited* nonstatutory exemption from antitrust sanctions.'" *State of Cal. v. Safeway Inc.*, 371 F.Supp.2d 1179, 1184 (C.D. Cal. 2005), *quoting Connell*, 421 U.S. at 622 (emphasis original to *State of Cal.*). *Brown v. Pro Football, Inc.*, 518 U.S. 231 (1996), explained that the NSLE has been recognized in only the narrowest of circumstances, "to make the [collective-bargaining] process work," or, put another way, "to allow meaningful collective bargaining to take place." *Id.* at 237.

*Second*, Defendants erroneously represent that a new case, *Credit Suisse Sec. (USA) LLC v. Billing*, ___ U.S. ___, 127 S. Ct. 2383 (2007), compels reconsideration and reversal of this Court's May 2005 summary judgment ruling on the NSLE. *Credit Suisse* involved the idiosyncratic antitrust claims of a putative litigation class of purchasers of newly-issued *securities* against a syndicate of Wall Street investment underwriting firms that issued the securities:

> [t]he buyers claim that the underwriters unlawfully agreed with one another that they would not sell shares of a popular new issue to a buyer unless that buyer committed (1) to buy additional shares of that security later at escalating prices (a practice called "laddering"), (2) to pay unusually high commissions on subsequent security purchases from the underwriters, or (3) to purchase from the underwriters other less desirable securities (a practice called "tying").

*See id.* at 2387. In defense, the underwriting firms responded that the *federal securities laws*, as administered by the *Securities and Exchange Commission* (the "SEC"), impliedly precluded the application of the antitrust laws to the fact pattern in question. *See id.* at 2389. The Supreme Court framed the case's legal question as "whether there is a plain repugnancy between these antitrust claims

and the *federal securities law*." *Id.* at 2387 (emphasis added).  Significantly, *Credit Suisse* has *absolutely nothing* to do with, and says absolutely nothing about, the NSLE, the statutory labor exemption, the NLRB, labor law, employers, employees, unions, CBAs, or the sharing of revenues among business competitors based on their recent market shares in the relevant market.  For this obvious and overwhelming reason, *Credit Suisse* is inapplicable to the instant case.

*Credit Suisse* does restate in general terms the interplay between federal regulatory statutes and the antitrust laws, as follows:

> Sometimes regulatory statutes explicitly state whether they preclude application of the antitrust laws.  Compare, e.g., Webb-Pomerene Act, 15 U.S.C. § 62 (expressly providing antitrust immunity) with § 601(b)(1) of the Telecommunications Act of 1996, 47 U.S.C. § 152 (stating that antitrust laws remain applicable).  Where regulatory statutes are silent in respect to antitrust, however, courts must determine whether, and in what respects, they implicitly preclude application of the antitrust laws.  Those determinations may vary from statute to statute, depending upon the relation between the antitrust laws and the regulatory program set forth in the particular statute, and the relation of the specific conduct at issue to both sets of laws.

*Id.* at 2389.  Notably, there is nothing new in these statements; for support, the Supreme Court cited a string of cases going back to 1963.

Defendants improperly attempt to use this restatement of existing law as the foundation for an exceedingly perfunctory "argument" that the National Labor Relations Act (the "NLRA") has now become one of the regulatory statutes that precludes application of the antitrust laws.  The *entire defense argument* is the following two sentences:  "There can be no doubt that there is a plain repugnancy between the Attorney General's attempt to remove the Employers' countermeasure against the Unions' economic weapons, on the one hand, and the regulatory regime presided over by the Board, on the other.  Accordingly, the Attorney General's claim is precluded."

Contrary to Defendants' bald assertions, *Credit Suisse* acknowledged that the preclusive effect of any regulatory statute on antitrust enforcement must be

1    determined individually for that statute, and thereby expressly *avoided* giving

2    guidance on how the NLRA (or any other act outside the securities law arena)

3    interacts with the antitrust laws. *See id.* at 2389. *Credit Suisse* is no help to

4    Defendants in the present case.

5          *Third*, the NLRB does not rule on the antitrust legality of agreements or

6    actions of parties to labor disputes. "Congress has not vested the NLRB with

7    responsibility to enforce the Sherman Act, review anticompetitive effects upon

8    the market, or harmonize the nation's labor laws with the Sherman Act." *State of*

9    *Cal.*, 371 F. Supp.2d at 1196; *National Labor Relations Bd. v. Insurance Agents'*

10   *Int'l Union*, 361 U.S. 477, 489-90 (1960) (explaining limited role of NLRB in

11   evaluating weapons of parties to labor disputes); *Food & Commercial Workers*

12   *Local 137 v. Food Employers Council*, 827 F.2d 519, 521 n.1 (9th Cir. 1987)

13   ("*[T]he complaint alleged a violation of the Sherman Act, albeit one that might*

14   *involve a violation of the National Labor Relations Act as well. Such a suit is*

15   *not within the exclusive primary jurisdiction of the Board*") (emphasis added);

16   *cf. Chamber of Commerce of the U.S. v. Lockyer*, 463 F.3d 1076, 1085 (9th Cir.

17   2006) (holding that the NLRB is *not* "afforded flexibility in picking and

18   choosing which economic devices of labor and management shall be branded

19   unlawful"; such regulation is beyond the NLRB's jurisdiction). Indeed, at least

20   one NLRB Trial Examiner has taken the same position:

21              that the question whether a collective-bargaining agreement violates
                the Sherman Act is for the courts, and not the National Labor
22              Relations Board, to determine. First of all, there is no method by
                which the parties to an antitrust case could be assured of obtaining a
23              Board ruling on the question. The Board's procedures do not lend
                themselves to the determination of issues of Federal law that arise in
24              antitrust litigation. Secondly, the statutory scheme of the National
                Labor Relations Act shows that Congress intended the federal
25              courts to determine questions under the Sherman Antitrust Act
                which arise in antitrust cases within their statutory jurisdiction.

26

27

28

9

1   *H.L. Washum*, 172 NLRB 328, 366 (1968).

2                              Respectfully submitted,

3   Date:  February 21, 2008    Office of the California Attorney General

4

5

6   JONATHAN M. EISENBERG

7   Deputy Attorney General
    Attorneys for Plaintiff
8   STATE OF CALIFORNIA

9                              E-mail:  jonathan.eisenberg@doj.ca.gov

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28