UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT



**FILED**

SEP 15 2011

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

STATE OF CALIFORNIA, ex rel.
Edmund G. Brown, Jr.,

        Plaintiff - Appellant,

   v.

SAFEWAY, INC., a Safeway Company
doing business as Vons; et al.,

        Defendants - Appellees.

No. 08-55671

D.C. No. 2:04-cv-00687-AG-SS
U.S. District Court for Central
California, Los Angeles

**MANDATE**

RECEIVED
CLERK, U.S. DISTRICT COURT

SEP 1 5 2011

CENTRAL DISTRICT OF CALIFORNIA
BY            DEPUTY

STATE OF CALIFORNIA, ex rel.
Edmund G. Brown, Jr.,

        Plaintiff - Appellee

   v.

SAFEWAY, INC., a Safeway Company
doing business as Vons; et al.,

No. 08-55708

D.C. No. 2:04-cv-00687-AG-SS
U.S. District Court for Central
California, Los Angeles

The judgment of this Court, entered July 12, 2011, takes effect this date.

This constitutes the formal mandate of this Court issued pursuant to Rule

41(a) of the Federal Rules of Appellate Procedure.

FOR THE COURT:
Molly C. Dwyer
Clerk of Court

Rhonda Roberts
Deputy Clerk

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| STATE OF CALIFORNIA, ex rel. Kamala D. Harris,*<br>     *Plaintiff-Appellant,*<br><br>     v.<br><br>SAFEWAY, INC., a Safeway Company doing business as Vons; ALBERTSONS, INC.; RALPHS GROCERY COMPANY, a division of the Kroger Company; FOOD 4 LESS FOOD COMPANY, a division of the Kroger Company; VONS COMPANIES INC., an indirect, wholly owned subsidiary of Safeway, Inc.,<br>     *Defendants-Appellees.* | No. 08-55671<br><br>D.C. No.<br>2:04-cv-00687-AG-SS |

---

*Kamala D. Harris is substituted for her predecessor, Edmund G. Brown, as Attorney General of the State of California, pursuant to Federal Rule of Appellate Procedure 43(c)(2).

9279

STATE OF CALIFORNIA, ex rel.
Kamala D. Harris,
                    *Plaintiff-Appellee,*

                    v.

SAFEWAY INC. a Safeway Company
doing business as Vons;
ALBERTSONS, INC.; RALPHS GROCERY
COMPANY, a division of the Kroger
Company; FOOD 4 LESS FOOD
COMPANY, a division of the Kroger
Company; VONS COMPANIES INC.
an indirect, wholly owned
subsidiary of Safeway, Inc.
                    *Defendants-Appellants.*

No. 08-55708

D.C. No.
2:04-cv-00687-
AG-SS

OPINION

Appeal from the United States District Court
for the Central District of California
Andrew J. Guilford, District Judge, Presiding

Argued and Submitted
March 22, 2011—San Francisco, California

Filed July 12, 2011

Before: Alex Kozinski, Chief Judge, Mary M. Schroeder,
Stephen Reinhardt, Susan P. Graber, M. Margaret McKeown,
Raymond C. Fisher, Ronald M. Gould, Richard C. Tallman,
Johnnie B. Rawlinson, Richard R. Clifton, and
N. Randy Smith, Circuit Judges.

Opinion by Judge Gould;
Concurrence by Judge Fisher;
Partial Dissent by Chief Judge Kozinski;
Partial Concurrence and Partial Dissent by Judge Reinhardt

## COUNSEL

Kamala D. Harris, Attorney General for the State of California; Kathleen E. Foote, Senior Assistant Attorney General; Barbara M. Motz, Supervising Deputy Attorney General; Patricia L. Nagler, Deputy Attorney General; Cheryl L. Johnson, Deputy Attorney General; and Jonathan M. Eisenberg (argued), Deputy Attorney General, Los Angeles, California, for the plaintiff-appellant/cross-appellee.

Alan B. Clark, Peter K. Huston, Latham & Watkins LLP, Los Angeles, California, and Jeremy P. Sherman, Seyfarth Shaw LLP, Chicago, Illinois, for respondents-appellees/cross-appellants Safeway, Inc. and The Vons Companies, Inc.

Jeffrey A. LeVee, Craig E. Stewart (argued), and Kate P. Wallace, Jones Day, Los Angeles, California, for respondent-appellee/cross-appellant Albertson's, Inc.

Robert B. Pringle, Winston & Strawn, San Francisco, California, for respondents-appellees/cross-appellants Ralphs Grocery Company and Food 4 Less Company.

Robin S. Conrad, Shane B. Kawka, Washington, District of Columbia, for amicus curiae Chamber of Commerce of the United States.

Charles I. Cohen, Jonathan C. Fritts and David R. Broderdorf, Washington, District of Columbia, for amici curiae Chamber of Commerce of the United States and Council on Labor Law Equality.

Jeffrey A. Berman, Los Angeles, California, for amicus curiae Employers Group.

Robert M. McKenna, Attorney General of Washington and Mark O. Brevard, Assistant Attorney General, Seattle, Washington; and Nancy H. Rogers, Attorney General of Ohio and Jennifer L. Pratt, Chief, Antitrust Section, Columbus, Ohio, for amici curiae Arizona, Connecticut, Delaware, Maryland, Massachusetts, Mississippi, Missouri, Montana, Nevada, Ohio, Oklahoma, Oregon, Tennessee, Washington, and West Virginia.

Nicholas W. Clark, Washington, District of Columbia, for amicus curiae United Food and Commercial Workers International Union.

Michael D. Four, Los Angeles, California, for amici curiae UFCW Local Unions 135, 324, 770, 1036, 1167, 1428, and 1442.

Andrew D. Roth, Washington, District of Columbia, for amici curiae United Food and Commercial Workers International

Union, UFCW Local Unions 135, 324, 770, 1036, 1167, 1428, and 1442, Change to Win, and AFL-CIO.

Richard M. Brunell, Washington, District of Columbia, for amicus curiae American Antitrust Institute.

---

**OPINION**

GOULD, Circuit Judge:

We must decide whether an agreement among competitors to share revenues during the term of a labor dispute is exempt from the antitrust laws under the non-statutory labor exemption, and if not, whether the agreement should be condemned as a per se violation of the antitrust laws or on a truncated "quick look," or whether more detailed scrutiny is required. We conclude that the agreement is not immune from the antitrust laws, but that summary condemnation, whether as a per se violation or on a "quick look," is improper. We affirm the district court.

## I. Factual and Procedural History

In the fall of 2003, the collective-bargaining agreement between several local chapters of the United Food and Commercial Workers ("UFCW") and three large supermarket chains operating in Southern California (Albertson's, Ralphs, and Vons, a subsidiary of Safeway, Inc.) was set to expire. Another grocery chain, Food 4 Less,[1] had a separate contract with UFCW that was set to expire several months later, in February 2004. Before the contracts expired and with the consent of the union, Albertson's, Ralphs, and Vons formed a multi-employer bargaining unit in the summer of 2003 for negotiation of a successor labor contract.

---

[1]Food 4 Less is an unincorporated operating division of Ralphs; it is a fictitious name under which Ralphs does business in Southern California.

Albertson's, Ralphs, Vons, and Food 4 Less ("Defendants" or "grocers") entered into a Mutual Strike Assistance Agreement[2] ("MSAA") in September 2003, in anticipation of the potential use of "whipsaw" tactics, where unions exert pressure on one employer within a multi-employer bargaining unit through, for example, selective strikes or picketing. Among other things, the MSAA provided that if one party to the agreement was struck by the union, the other grocers (with the exception of Food 4 Less) would lock out all their union employees within 48 hours.

Pertinent to the antitrust claims that we assess, the MSAA also included a revenue-sharing provision ("RSP"), providing that in the event of a strike/lockout, any grocer that earned revenues above its historical share relative to the other chains during the strike period would pay 15% of those excess revenues as reimbursement to the other grocers to restore their pre-strike shares.[3] The MSAA specified that the strike/lockout period would begin at the start of the week in which the strike/lockout commenced and continue for two weeks following the end of the strike/lockout.[4] According to a responsible grocer executive, the 15% figure was designed to estimate

---

[2]There were in fact two agreements with identical terms, one pertaining to UFCW Local No. 770 and the other to UFCW Locals No. 135, 324, 1036, 1167, 1428, and 1442. We will refer to them as one agreement for simplicity.

[3]To implement this arrangement, the grocers agreed to submit their weekly sales data for an eight-week period before the strike and for the strike period to a certified public accountant. The CPA would use the data to determine the grocers' historical percentage shares of the market (relative to one another) prior to the strike, and to calculate the aggregate increase or decrease in each grocer's average weekly sales during the strike. The CPA would then multiply the total amount of disparity for each grocer by 15% and those grocers earning revenues above their historical share would pay that amount in compensation to the lower performing grocer to return all grocers to their relative pre-strike positions. Food 4 Less and Ralphs were treated as one unit for purposes of this calculation.

[4]The parties refer to this as the "two-week tail."

the incremental profit the grocers earned on each additional dollar of revenue.

On October 11, 2003, after union contract negotiations broke down, the unions began a strike against Vons stores in the region. Albertson's and Ralphs locked out their union employees the next day pursuant to the terms of the MSAA. The unions at first picketed Albertson's, Ralphs, and Vons stores, but soon elected to pull their pickets from Ralphs stores and focus their picketing efforts on Albertson's and Vons only. About four-and-a-half months after the strike began, at the end of February 2004, the grocers and the unions reached an agreement and the strike/lockout ended. In accord with the revenue-sharing provision of the MSAA, Ralphs paid about $83.5 million to Vons, and it paid about $62.5 million to Albertson's.

While the strike was in progress, the State of California brought an action against the grocers alleging that the RSP violated Section 1 of the Sherman Act, which prohibits any contract, combination, or conspiracy in restraint of trade or commerce.[5] 15 U.S.C. § 1. After limited discovery, the grocers moved for summary judgment on the ground that the RSP was immune from antitrust scrutiny under the non-statutory labor exemption. The district court denied the motion, holding that the exemption was inapplicable. California then moved for summary judgment, contending that the RSP was a per se violation of § 1, or in the alternative that it was unlawful under an abbreviated rule of reason or "quick look" antitrust analysis. The district court denied that motion as well. The grocers renewed their motion for summary judgment on the non-statutory labor exemption, and the district court again denied their motion.

While preserving their right to appeal the district court's rulings, the parties stipulated to the entry of final judgment for

_____

[5]California sought a permanent injunction and attorneys' fees.

the grocers after California agreed not to pursue the theory that the RSP violated § 1 of the Sherman Act under a full rule of reason analysis, and the grocers agreed not to pursue the various affirmative defenses they had pleaded, with the exception of the non-statutory labor exemption. The district court entered judgment in accordance with the parties' stipulations.

California timely appealed the final judgment, arguing that the RSP should be condemned as a per se violation or on a "quick look," and the grocers timely cross-appealed, arguing that the non-statutory labor exemption should apply. We issued an opinion affirming in part, reversing in part, and remanding. *California ex rel. Brown v. Safeway, Inc.*, 615 F.3d 1171 (9th Cir. 2010). A majority of non-recused active judges voted to rehear this case en banc pursuant to Circuit Rule 35-3. *California ex rel. Brown v. Safeway, Inc.*, 633 F.3d 1210 (9th Cir. 2011).

## II.  Jurisdiction and Standard of Review

We have jurisdiction under 28 U.S.C. § 1291. We review de novo a district court's denial of summary judgment on the basis of the non-statutory labor exemption. *Clarett v. Nat'l Football League*, 369 F.3d 124, 130 (2d Cir. 2004). The selection of the proper mode of antitrust analysis is a question of law, which we review de novo. *United States v. Brown*, 936 F.2d 1042, 1045 (9th Cir. 1991); *see also Craftsmen Limousine, Inc. v. Ford Motor Co.*, 363 F.3d 761, 772 (8th Cir. 2004); XI Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1909b, at 279 (2d ed. 2005) (hereinafter Areeda & Hovenkamp).

## III.  Non-Statutory Labor Exemption

On cross-appeal, the grocers contend that the district court erred in holding that the RSP is not immune from the Sherman Act under the non-statutory labor exemption, and they

urge that summary judgment should have been entered in their favor on the basis of the exemption.

## A.   Background

Court have recognized both "statutory" and "non-statutory" labor exemptions to the antitrust laws. *Phoenix Elec. Co. v. Nat'l Electric Contractors Ass'n*, 81 F.3d 858, 860 (9th Cir. 1996). The statutory exemption, which is not invoked here, establishes that labor unions are not combinations or conspiracies in restraint of trade and exempts certain union activities from scrutiny under the antitrust laws. *Connell Constr. Co. v. Plumbers & Steamfitters Local Union No. 100*, 421 U.S. 616, 621-22 (1975). However, the statutory exemption does "not exempt concerted action or agreements between unions and nonlabor parties." *Id.* at 622.

[1] The non-statutory labor exemption, invoked by the grocers as a defense in this case, has been inferred from federal labor statutes. These "set forth a national labor policy favoring free and private collective bargaining," "require good-faith bargaining over wages, hours, and working conditions," and "delegate related rulemaking and interpretive authority to the National Labor Relations Board." *Brown v. Pro Football, Inc.*, 518 U.S. 231, 236 (1996). The implicit exemption "interprets the labor statutes . . . as limiting an antitrust court's authority to determine, in the area of industrial conflict, what is or is not a 'reasonable' practice" and "substitutes legislative and administrative labor-related determinations for judicial antitrust-related determinations" in that area. *Id.* at 236-37. "[S]ome restraints on competition imposed through the bargaining process must be shielded from antitrust sanctions" to give effect to federal labor policy and to allow meaningful collective bargaining to occur. *Id.* at 237.

"The Supreme Court has never delineated the precise boundaries of the [non-statutory labor] exemption, and what guidance it has given as to its application has come mostly in

cases in which agreements between an employer and a labor union were alleged to have injured or eliminated a competitor in the employer's business or product market." *Clarett*, 369 F.3d at 131. The Court first elaborated on the reach of the non-statutory labor exemption in *Allen Bradley Co. v. Local Union No. 3, International Brotherhood of Electrical Workers*, involving a series of agreements between an electrical workers union and several manufacturers and contractors in which the manufacturers and contractors agreed to do business exclusively with other companies that employed union workers. 325 U.S. 797 (1945). Those agreements were part of "a far larger program . . . to monopolize all the business in New York City, to bar all other business men from that area, and to charge the public prices above a competitive level" and created a "situation . . . not included within the [relevant] exemptions." *Id.* at 809. The Court explained that Congress did not intend to bestow on unions "complete and unreviewable authority to aid business groups to frustrate [antitrust legislation's] primary objective." *Id.* at 810.

   [2] In *United Mine Workers of America v. Pennington*, the Supreme Court similarly declined to apply the exemption to insulate a wage agreement between a union of mine workers and large coal companies. 381 U.S. 657 (1965). The union and the large companies, to eliminate smaller coal companies and permit the larger companies to control the market, agreed to a series of terms, including increased wages for union workers. *Id.* at 660. A smaller coal mine operator, unable to pay the increased wages demanded by the union under the terms of their agreement with the larger companies, filed suit claiming that the agreement violated the Sherman Act. *Id.* at 659. In exploring the boundaries of the exemption, the Court observed that, had the union and employers entered into an agreement in which they collectively set prices for coal, they could not defend that agreement from antitrust attack, because "the restraint on the product market is direct and immediate, is of the type characteristically deemed unreasonable under the Sherman Act and the union gets from the promise nothing

more concrete than a hope for better wages to come." *Id.* at 663. The Court rejected the argument that, simply because the agreement related to wages—a subject at the heart of bargaining—rather than prices, the exemption should apply. *Id.* at 664-69. Though "a union may conclude a wage agreement with the multi-employer bargaining unit without violating the antitrust laws," the Court explained, "there are limits to what a union or an employer may offer or extract in the name of wages." *Id.* at 664-65. "[A] union forfeits its exemption from the antitrust laws when it is clearly shown that it has agreed with one set of employers to impose a certain wage scale on *other* bargaining units." *Id.* at 665 (emphasis added). The Court held that the wage agreement was not exempt from the antitrust laws. *Id.* at 669.

The exemption was applied in a fractured decision in *Local Union No. 189, Amalgamated Meat Cutters & Butcher Workmen of North America v. Jewel Tea Co.*, 381 U.S. 676 (1965), which the Supreme Court issued together with its opinion in *Pennington.* The union representing butchers in Chicago reached a collective-bargaining agreement with a multi-employer bargaining unit of food retailers that included a marketing hours restriction, which prohibited the sale of meat before 9:00 a.m. and after 6:00 p.m., and on Sundays. *Id.* at 679-80. One member of the bargaining unit, Jewel Tea, initially rejected the provision limiting hours, but eventually decided to sign a contract including such a provision under threat of a strike. *Id.* at 680-81. Jewel Tea brought suit against the union, claiming that the marketing hours restriction in the contract violated the Sherman Act as it was the product of a conspiracy to prevent the retail sale of fresh meat during the evening hours. *Id.* at 681-82. The plurality opinion explained that "the marketing-hours restriction, like wages, and unlike prices, is so intimately related to wages, hours and working conditions that the unions' successful attempt to obtain that provision . . . falls within the protection of the national labor policy and is therefore exempt from the Sherman Act." *Id.* at 689-90. Three other justices, concurring in the judgment (but

dissenting in *Pennington*) viewed the exemption more broadly, and would have held that all "collective bargaining activity concerning mandatory subjects of bargaining under the Labor Act is not subject to the antitrust laws." *Id.* at 710 (Goldberg, J., concurring).

The Court declined to apply the non-statutory exemption to a labor-employer agreement in *Connell Construction Co.*, 421 U.S. at 621. A union representing workers in the plumbing and mechanical trades in Dallas entered into a multi-employer bargaining agreement with a large group of mechanical contractors. *Id.* at 619. The union asked Connell Construction— a general building contractor that was outside the bargaining agreement and whose workers were not represented by the union—to agree to subcontract mechanical work only to firms that had a contract with the union. *Id.* Connell initially refused to sign the agreement but acquiesced when the unions picketed one of its construction sites. *Id.* at 620. The Court recognized the importance of the non-statutory exemption for labor policy, but cautioned that "while the statutory exemption allows unions to accomplish some restraints by acting unilaterally, the nonstatutory exemption offers no similar protection when a union and a nonlabor party agree to restrain competition in a business market." *Id.* at 622-23 (citation omitted). The exemption did not shield the agreement from the antitrust laws because such a "direct restraint on the business market has substantial anticompetitive effects, both actual and potential, that would not follow naturally from the elimination of competition over wages and working conditions." *Id.* at 625.

Most recently, in *Brown v. Pro Football, Inc.*, the Supreme Court for the first time extended the non-statutory labor exemption to an agreement that was solely among employers. 518 U.S. at 238; *see also* IB Areeda & Hovenkamp ¶ 257b2, at 141 (3d ed. 2006) (explaining that "historically the courts were reluctant to extend the exemption . . . to an agreement among employers that did not involve any employee group as

a participant" but that the Supreme Court did extend the exemption to that situation in *Brown*); *id.* at 151-52.

*Brown* involved an agreement among National Football League teams to restrain the salaries of certain classes of players. *Brown*, 518 U.S. at 234-35. The collective-bargaining agreement between the players' union and the league expired, and bargaining began for a new contract. *Id.* at 234. During the negotiations, the NFL adopted a plan that would permit each team to create a developmental squad of rookies who would play in practice games with the team and sometimes in regular games as substitutes for injured players, and provided that the developmental squad players would be paid $1000 per week. *Id.* The players' union disagreed with these terms and insisted that developmental squad players get benefits and protections similar to those offered to regular players and that they be free to negotiate their own salaries rather than be paid the fixed rate. *Id.* Two months later, bargaining reached an impasse, and the NFL unilaterally implemented the developmental squad program under its proposed terms. *Id.* at 235. The developmental squad players brought an antitrust action against the league and the individual teams, claiming that the agreement to pay them $1000 per week violated the Sherman Act. *Id.*

The Court began by examining the "history and logic" of the exemption, observing that it "interprets the labor statutes in accordance with" the intent of Congress to prevent "judicial use of antitrust law to resolve labor disputes" and limits antitrust courts' authority to determine what qualifies as a reasonable practice in industrial conflict. *Id.* at 236-37. With citation to the leading cases *Connell*, *Jewel Tea*, and *Pennington*, the Court explained that the exemption is essential to give effect to federal labor policy and allow meaningful collective bargaining because "it would be difficult, if not impossible, to require groups of employers and employees to bargain together, but at the same time to forbid them to make among themselves or with each other *any* of the competition-

restricting agreements potentially necessary to make the process work." *Id.* at 237.

The Court then identified the question presented as one of scope: whether the exemption applies to an agreement among several employers bargaining together to implement after impasse the terms of their last best good-faith wage offer. *Id.* at 238. The Court recognized at the outset that labor law "regulates directly, and considerably, the kind of behavior here at issue—the postimpasse imposition of a proposed employment term concerning a mandatory subject of bargaining." *Id.* Labor regulations "reflect the fact that impasse and an accompanying implementation of proposals constitute an integral part of the bargaining process," and case law demonstrates that implementation of terms after impasse is a familiar practice in multi-employer bargaining. *Id.* at 239-40. Under these circumstances, "to subject the practice to antitrust law is to require antitrust courts to answer a host of important practical questions about how collective bargaining over wages, hours, and working conditions is to proceed—the very result that the implicit labor exemption seeks to avoid." *Id.* at 240-41.

The Court addressed and rejected several proposed limitations or boundaries to the exemption that were suggested by the parties and amici. *Id.* at 243-50. The Court first rejected the argument that the exemption should be limited to existing labor-management agreements. *Id.* at 243-44. The Court emphasized that, for the immunity to be effective, it must apply not just to the completed bargain but also to the process by which the bargain is made, including the process before an initial collective-bargaining agreement is approved and the period after the agreement has expired. *Id.; see also* IB Areeda & Hovenkamp ¶ 257b2. The Court rejected the suggestion that the exemption should terminate when collective-bargaining negotiations reach impasse or a reasonable time thereafter and another suggestion that the exemption permit employers to make post-impasse agreements about bargaining tactics but not the terms of any policy directed at employees.

*Brown*, 518 U.S. at 244-48. The Court also declined to hold that the arena of professional sports is "special" and should be viewed differently than other industries with respect to the antitrust exemption. *Id.* at 248-49.

The Court described its decision to apply the exemption to the football teams' conduct in this way:

> That conduct took place during and immediately after a collective- bargaining negotiation. It grew out of, and was directly related to, the lawful operation of the bargaining process. It involved a matter that the parties were required to negotiate collectively. And it concerned only the parties to the collective-bargaining relationship.

*Id.* at 250. The Court then clarified that its "holding is not intended to insulate from antitrust review every joint imposition of terms by employers, for an agreement among employers could be sufficiently distant in time and in circumstances from the collective-bargaining process that a rule permitting antitrust intervention would not significantly interfere with that process." *Id.*

## B.  Positions of the Parties

The grocers contend that *Brown* immunizes employer agreements related in time and circumstance to the collective-bargaining process, and that the economic weapons parties use to advance their positions in a labor dispute—like an agreement to share revenue to weaken the effects of a whip-saw strike—are "as much a part of the collective bargaining process as are negotiations over terms." The grocers stress that labor policy approves the use of economic weapons, and that economic weapons are "part and parcel" of the collective-bargaining process that should be exercised free from governmental regulation. *NLRB v. Ins. Agents' Int'l Union*, 361 U.S. 477, 489 (1960).

By contrast, California urges a narrower reading of *Brown*, one that would permit an exemption for agreements among employers only where "needed to make the collective bargaining process work," relying on the Court's words in *Brown*. California contends that *Brown* imposes a multi-factor analysis that takes into account whether the alleged anticompetitive conduct is anchored in the collective-bargaining process, concerns only the parties to the collective-bargaining process, and relates to wages, hours, and conditions of employment or other mandatory subjects of collective bargaining. In California's view, the RSP was not necessary to allow meaningful collective bargaining to take place and collective bargaining should not be defined so broadly as to include financial weapons like the RSP. The RSP helped the employers to gain advantage in negotiations, but was not integral to the bargaining process. Further, California argues, the RSP does not relate to the core subjects of collective bargaining (wages, hours, and working conditions) and primarily affects a "product market" not a "labor market." California also notes, as did the district court, that the RSP included an entity that was not a party to the collective-bargaining agreement (Food 4 Less), and that the RSP remained in effect for two weeks after bargaining ended.

## C.   Exemption Inapplicable

We reject the grocers' broad reading of the exemption and hold that, under the totality of circumstances here, and in light of the history and logic of the exemption as well as the Supreme Court's guidance in *Brown*, application of the exemption to shield the RSP from antitrust scrutiny is not warranted.

[3] The Court in *Brown* stated, as a premise of its reasoning, that the practice under examination—the unilateral imposition of terms by employers after impasse—was "unobjectionable as a matter of labor law and policy" and that it was regulated "directly, and considerably," by labor laws.

*Brown*, 518 U.S. at 238. In other words, post-impasse imposition of terms is not only an accepted practice in labor negotiation, but one that has been extensively regulated and "carefully circumscribed." *Id.* By contrast, the use of revenue sharing as an economic weapon during a labor dispute does not enjoy any such endorsement, much less a history of careful regulation, from the realm of labor law and policy. Neither party points to a body of regulatory or judicial decisions that establishes revenue sharing among employers in a bargaining unit as an accepted economic weapon during a labor dispute.[6] From the outset of our analysis, therefore, the RSP is on different footing than the agreement between the NFL club owners in *Brown*.

[4] Addressing the practice of revenue sharing in the context of multi-employer bargaining, we conclude that the salient concerns underlying *Brown* and central to the history and logic of the exemption are not present here. The agreement to share revenues during and shortly after a labor dispute does not play a significant role in collective bargaining, nor is it necessary to permit meaningful collective bargaining to take place. The RSP does not relate to any core subject matter of bargaining, namely wages, hours, and working conditions,

---

[6]The grocers rely on a decision from the Denver region of the NLRB, suggesting that a similar revenue sharing provision was a permissible practice, *see* Supp. Excerpts of Record (Vol. 3) 429-32, and on two courts of appeals decisions, *Air Line Pilots Ass'n International v. Civil Aeronautics Board*, 502 F.2d 453, 456-57 (D.C. Cir. 1974) (holding that revenue sharing among airline employers did not violate the Railway Labor Act) and *Kennedy v. Long Island Rail Road Co.*, 319 F.2d 366, 368 (2d Cir. 1963) (holding that a joint strike insurance plan among leading railroads did not violate the Railway Labor Act, the Interstate Commerce Act, or the Sherman Act), for the proposition that revenue sharing is an accepted economic weapon. But a decision of a regional NLRB tribunal and the two appellate cases implicating, respectively, a different statutory regime and a different type of arrangement, are not sufficiently prevalent authority to demonstrate the acceptability of the practice. To the contrary, these few cases show that revenue sharing in this context is sufficiently rare that it has not been widely examined by agencies and courts as a labor practice.

but rather relates principally to the relative revenues of the grocers in the market and the temporary, artificial maintenance of those revenues.

Although it is not an easy question, in our view the grocers cannot succeed in exempting their agreement merely by asserting its value to them and purpose as an economic weapon in the labor dispute over core bargaining subjects. If this were so, a group of employers could claim that fixing prices made them stronger and was useful as an economic weapon in a strike. Quite obviously, that could not be sufficient to gain exemption. It would be like saying "anything goes in a strike context," and we cannot read *Brown* so broadly. The RSP was designed to strengthen the grocers' position in negotiations with the union, but that fact alone does not entitle the agreement to antitrust immunity. Employers might undertake any number of activities to strengthen their bargaining posture and force unions to accept their terms, but the law does not necessarily exempt all such activities.

Our decision not to expand the law of non-statutory labor exemption to shield the grocers from antitrust liability in these circumstances does not place them in an untenable position or "introduce instability and uncertainty into the collective-bargaining process." *Brown*, 518 U.S. at 242. The inability of grocers to enter into an RSP for fear of possible antitrust liability does not hinder the functioning of the collective-bargaining process. Grocers may continue to negotiate terms with the union without an RSP in place and may bring other potent and well-established forms of economic pressure to bear to enhance their bargaining position, including lockouts and the use of replacement workers.

[5] Further, the RSP concerned the "business" or "product" market, rather than the labor market. "The case for the applicability of the non-statutory exemption is strongest where the alleged restraint operates primarily in the labor market and

has only tangential effects on the business market." *Am. Steel Erectors, Inc. v. Local Union No. 7, Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron Workers*, 536 F.3d 68, 79 (1st Cir. 2008) (citing *Clarett*, 369 F.3d at 134 n.14). Stated another way, and relying on the insights of a perceptive antitrust law commentator, in general, "an agreement among employers restraining a product or nonlabor service market enjoys no labor immunity."[7] IB Areeda & Hovenkamp ¶ 257a, at 131; *see also Barnett Pontiac-Datsun, Inc. v. FTC (In re Detroit Auto Dealers Ass'n)*, 955 F.2d 457, 468 (6th Cir. 1992). The RSP, although intended to strengthen the grocers' position in bargaining for terms related to wages, hours, and working conditions, does not primarily affect the labor market. The fact that the grocers were sharing profits did not have direct consequences for the labor market. This aspect of the RSP lends further support to the view that application of the antitrust laws would not interfere with the bargaining process. While we stop short of endorsing the concept that as a strict rule the non-statutory labor exemption can only arise in a case involving restraint of terms directly relating to labor,

---

[7]The grocers argue that the distinction between agreements affecting business or product markets and those affecting labor markets is no longer relevant to the non-statutory labor exemption analysis following *Brown*. The Court did not expressly address the significance of the distinction in deciding *Brown*. The D.C. Circuit below had held that the exemption waives antitrust liability for restraints on competition that "operate primarily in a labor market characterized by collective bargaining," but the Supreme Court chose to interpret the exemption more narrowly. *Brown*, 518 U.S. at 235 (quoting *Brown v. Pro Football, Inc.*, 50 F.3d 1041, 1056 (D.C. Cir. 1995)). At no point did it explicitly reject the product market/labor market distinction or question its earlier cases that relied in part on the distinction. *Id.* at 236, 237 (citing *Pennington*, 381 U.S. at 657). *Brown* suggests that the distinction may not be central to the analysis in all cases, but we conclude that it remains a relevant consideration in determining whether a restraint "plays a significant role in a collective-bargaining process that itself constitutes an important part of the Nation's industrial relations system." *Brown*, 518 U.S. at 240. Other circuits are in accord. *E.g., Am. Steel Erectors*, 536 F.3d at 79; *Clarett*, 369 F.3d at 134 n.14.

that the restraint here is primarily a product market restraint does not encourage application of the non-statutory labor exemption.

Finally, the inclusion of a non-member of the collective-bargaining unit, Food 4 Less, in the agreement to share revenue during the terms of the strike counsels against application of the exemption. The fact that the unilateral post-impasse imposition of terms in *Brown* "concerned only the parties to the collective-bargaining relationship" appears to have been a significant factor supporting the application of the exemption in that case. *Brown*, 518 U.S. at 250. This is logical in light of the purposes of the exemption: the inclusion of non-bargaining employers in an agreement suggests that the conduct is not anchored in the collective-bargaining process and should instead be subject to scrutiny by antitrust laws designed to prevent unreasonable restraints. Here, the grocers offer us the explanation that, as an unincorporated division of Ralphs that was doing business under another name, Food 4 Less needed to be bound by the RSP to make its terms effective. While it may be true that the inclusion of Food 4 Less helped to effectuate the purposes of the agreement, Food 4 Less had a separate contract with the unions that was set to expire at a later date; negotiations for a new agreement were months away. Food 4 Less was not part of the collective bargaining unit, and its inclusion in the RSP, even if helpful to the grocers, suggests that the revenue sharing was not integral to the collective-bargaining process.

[6] The restraint here differs from that in *Brown* along virtually every dimension that the Court there found significant in addressing the applicability of the exemption: The revenue-sharing provision has not been approved or regulated by labor law, it was not directly related to the collective-bargaining process, it did not concern a matter that the parties were required to negotiate collectively, and it involved a party that was not a member of the collective-bargaining relationship. The RSP is sufficiently "distant . . . in circumstances from the

collective-bargaining process that a rule permitting antitrust intervention would not significantly interfere with that process." *Brown*, 518 U.S. at 250. We decline to read the Supreme Court's rejection of various limiting principles for the exemption in *Brown* as an invitation to apply the exemption broadly to any agreement loosely associated in time with bargaining, as the grocers advocate. To protect the employer agreement from antitrust scrutiny in this case would represent a major extension of the non-statutory labor exemption as described in *Brown* and, in our view, would run contrary to the history and logic of the exemption. An agreement among employers (some of which are members of a multi-employer bargaining unit and one of which is not) to re-allocate their revenues on a temporary basis to maintain market share while their workers are striking or locked out is not within the core concerns of labor law. Although the arguments advanced by the grocers may be relevant to their position that there was no unreasonable restraint of trade, they are not sufficient to require application of a non-statutory labor exemption.[8] The district court correctly concluded that the grocers' revenue-sharing agreement is not immune from antitrust scrutiny, and we affirm that conclusion.

We proceed to consider the merits of California's claim under the Sherman Act.[9]

---

[8]We are reluctant to expand the non-statutory exemption beyond the scope of *Brown* without further guidance from the Supreme Court. *See Brown*, 518 U.S. at 250 (noting that its holding was "not intended to insulate from antitrust review every joint imposition of terms by employers," but that it "need not decide in this case whether, or where, within these extreme outer boundaries to draw that line").

[9]Chief Judge Kozinski's partial dissent contends that, in light of the stipulations of the parties, our ruling on the non-statutory labor exemption is "very likely" an advisory opinion and beyond the scope of our jurisdiction. That position does not present a correct view of our Article III jurisdiction, and would seem to foreclose ruling on many issues squarely presented. The issue of whether the RSP is exempt from antitrust scrutiny —which was expressly ruled on by the district court and preserved for

## IV.  Antitrust Liability

### A.  Methods of Antitrust Analysis

[7] Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. "Congress designed the Sherman Act as a consumer welfare prescription." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 343 (1979) (internal quotation marks omitted). "Consumer welfare is maximized when economic resources are allocated to their best use" and when "consumers are assured competitive price and quality." *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995). "A restraint that has the effect of reducing the importance of consumer preference in setting price and output is not consistent with this fundamental goal of antitrust law." *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 107 (1984). Congress sought to ensure that competitors not cut deals aimed at stifling competition and at permitting higher prices to be charged to consumers than would be expected in a competitive environment, or permitting lower prices to be paid to those from whom competitors bought materials than a fair market rate. The touchstone is consumer good. Agreements of competitors, whether express or implicit, whether by formal agreement or otherwise, in restraint of trade are outlawed.

[8] The Supreme Court has repeatedly recognized that by the language of the Sherman Act, " 'Congress intended to out-

---

appeal by the parties—is a threshold question that logically precedes our examination of the antitrust issues. If in addressing the exemption we determined that the RSP should be insulated from antitrust review, there would be no need to consider whether the RSP could be condemned with a per se rule or under "quick look" analysis. We properly may determine whether the antitrust regime applies at all before we rule on the merits of the antitrust claim.

law only *unreasonable* restraints.' " *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006) (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997)). "[M]ost antitrust claims are analyzed under a 'rule of reason,' according to which the finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors . . . ." *State Oil*, 522 U.S. at 10. The rule of reason is the presumptive or default standard, and it requires the antitrust plaintiff to "demonstrate that a particular contract or combination is in fact unreasonable and anticompetitive." *Dagher*, 547 U.S. at 5.[10]

"Some types of restraints, however, have such predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit, that they are deemed unlawful *per se*." *State Oil*, 522 U.S. at 10. Such restraints " 'are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use.' " *Nw. Wholesale Stationers*, 472 U.S. at 289 (quoting *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958). Per se treatment is proper only "[o]nce experience with a particular kind of restraint enables

---

[10]As we have previously explained, "[t]he rule of reason weighs legitimate justifications for a restraint against any anticompetitive effects. We review all the facts, including the precise harms alleged to the competitive markets, and the legitimate justifications provided for the challenged practice, and we determine whether the anticompetitive aspects of the challenged practice outweigh its procompetitive effects." *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1156 (9th Cir. 2003) (citing *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 290-93 (1985) (footnote omitted)). The rule of reason is responsible for a sensible application of the antitrust laws that has guided courts for almost a century. *See Chi. Bd. of Trade v. United States*, 246 U.S. 231, 238 (1918) (providing the classic formulation of the rule of reason by Justice Brandeis: "The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition."); *see also Nat'l Soc'y of Prof'l Eng'rs*, 435 U.S. 679, 687-91 (1978); *Cont'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49-50 (1977).

the [c]ourt to predict with confidence that the rule of reason will condemn it."[11] *Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 344 (1982). "[A] 'departure from the rule-of-reason standard must be based upon demonstrable economic effect rather than . . . upon formalistic line drawing.' " *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 887 (2007) (second alteration in original) (quoting *Cont'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 58-59 (1977)). To justify per se condemnation, a challenged practice must have "manifestly anticompetitive" effects and lack "any redeeming virtue." *Id.* at 886 (internal quotation marks omitted). The Supreme Court has " 'expressed reluctance to adopt *per se* rules where the economic impact of certain practices is not immediately obvious.' " *Dagher*, 547 U.S. at 5 (quotation marks and ellipses omitted) (quoting *State Oil*, 522 U.S. at 10).

[9] "[A] certain class of restraints, while not unambiguously in the per se category, may require no more than cursory examination to establish that their principal or only effect is anticompetitive." XI Areeda & Hovenkamp ¶ 1911a, at 295-96. Stated another way, the rule of reason analysis can sometimes be applied " 'in the twinkling of an eye.' " *NCAA*, 468 U.S. at 109 n.39 (quoting Phillip Areeda, *The "Rule of Reason" in Antitrust Analysis: General Issues* 37-38 (Federal Judicial Center, June 1981)). The Supreme Court explained in *California Dental Ass'n v. FTC* that this truncated rule of reason or "quick look" antitrust analysis may be appropriately used where "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." 526 U.S. 756, 770 (1999). "The object is to see whether the experience of the market has been so clear, or necessarily will be, that a confident conclusion about the prin-

---

[11]Practices that have been held per se illegal include geographic division of markets and horizontal price fixing. *See Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 315 (2d Cir. 2008) (collecting cases).

cipal tendency of a restriction will follow from a quick (or at least quicker) look, in place of a more sedulous one." *Id.* at 781. Full rule of reason treatment is unnecessary where the anticompetitive effects are clear even in the absence of a detailed market analysis. *See NCAA*, 468 U.S. at 110. But if an arrangement "might plausibly be thought to have a net pro-competitive effect, or possibly no effect at all on competition," then a "quick look" form of analysis is inappropriate. *Cal. Dental Ass'n*, 526 U.S. at 771.

"[T]here is generally no categorical line to be drawn between restraints that give rise to an intuitively obvious inference of anticompetitive effect and those that call for more detailed treatment." *Id.* at 780-81. Instead, to borrow Justice Souter's phrase, there should be "an enquiry meet for the case" that looks to "the circumstances, details, and logic of a restraint." *Id.* at 781. "[I]n any rule of reason case the amount and type of evidence necessary to prove illegality varies with the amount of power that is apparent, with the nature and plausibility of proffered defenses, and with the judge's evaluation of the degree of harm posed by the restraint." XI Areeda & Hovenkamp ¶ 1911a, at 296.

## B.   Per Se Treatment

California characterizes the RSP as (1) a profit-pooling agreement and (2) a market-allocation agreement, and urges that prior judicial experience with these categories of restraints requires per se condemnation of the RSP. We disagree. Given its distinguishing attributes, the RSP cannot be placed in either category of per se illegal restraints.

### 1.   Profit-Pooling

California first argues that the RSP is "nearly identical" to the profit-pooling arrangement invalidated in *Citizen Publishing Co. v. United States*, 394 U.S. 131 (1969). In that case, the two daily newspapers operating in Tucson, Arizona, entered

into an agreement designed to "end any business or commercial competition" between them. *Id.* at 134. The newspapers agreed to consolidate their production, distribution, advertising, and most management operations in a jointly-held entity, to fix prices, and to refrain from engaging in any competing businesses. *Id.* The agreement also provided that all profits realized by the papers would be pooled and distributed pursuant to an agreed ratio. *Id.* The agreement was to continue in force for twenty-five years and was later extended to fifty years. *Id.* at 133. The Court held that the § 1 violations of the agreement were "plain beyond peradventure," and that "[p]ooling of profits pursuant to an inflexible ratio at least reduces incentives to compete for circulation and advertising revenues and runs afoul of the Sherman Act." *Id.* at 135.

[10] Contrary to California's assertions, the RSP differs from the profit-pooling arrangement condemned in *Citizen Publishing* in significant ways, precluding per se treatment of the RSP. First, the agreement among the grocers stated that sharing of revenues would occur during the period of the labor dispute and for two weeks thereafter. The RSP, by its design, was of both limited and unknown duration. The revenue sharing would terminate two weeks after the resolution of any labor dispute, and this "triggering" event for the expiration of the agreement could occur at any time. While the agreement in *Citizen Publishing* was scheduled to last for fifty years and could be terminated only by mutual consent of the parties, *id.* at 133, the RSP could end at any time—as soon as the labor dispute was resolved.[12] Indeed, the parties to the agreement could not know in advance how long the labor dispute would continue. The RSP lasted about five months.

[11] This temporary and short-term feature of the RSP dis-

---

[12]While labor disputes are capable of dragging on for months or years, it does not appear that anyone realistically expected the RSP to continue for anywhere near the extended period of time at issue in *Citizen Publishing*.

tinguishes the grocers' agreement from the profit-pooling condemned in *Citizen Publishing* in a way that is relevant to the key question of whether the RSP is a per se unreasonable restraint on trade, with a "predictable and pernicious anticompetitive effect." *State Oil*, 522 U.S. at 10; *see also Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1150-51 (9th Cir. 2003) (observing that per se rules are inappropriate in novel contexts and rejecting an argument against application of a per se rule because alleged novelty in the restraint was not relevant to issue of competitiveness). Because the RSP was of indefinite but temporary duration, the grocers retained incentives to compete during the labor dispute period. *See* XI Areeda & Hovenkamp ¶ 1906a, at 236, 238-39 (observing that, in most cases, courts assess "likely" effects to determine if a restraint is "naked" and subject to per se condemnation). Unlike the *Citizen Publishing* arrangement, which insulated the newspapers from competition by pooling profits for decades and left no reason to compete for customers, the unknown duration of the RSP, the strike-induced nature of the agreement, and the fact that it could end at any moment suggest that the grocers had a continued interest in maintaining and growing their customer bases. Temporary revenue sharing likely did not blunt the grocers' incentives to advertise, discount, and provide quality service. Grocers retained incentives to prevent the loss of customers during the strike, who might not return after switching to a competitor, and they also had incentive to win new customers that might return as regular customers after the strike ended.[13] Because the RSP was of a necessarily limited duration, the grocers' interest in preserving customer loyalty and maintaining or expanding market share likely persisted during the revenue-sharing period.[14]

---

[13]The Supreme Court has recognized that "[t]he retail food industry is very competitive and repetitive patronage is highly important." *NLRB v. Brown*, 380 U.S. 278, 284 (1965).

[14]An agreement of limited and/or indefinite duration could have obvious anticompetitive effects and violate Section 1, for example, an agreement of competitors controlling most of the market to fix prices for a month to the detriment of consumers. But here, the limited and unknown length of the RSP separates it from a category of restraints with which we are sufficiently experienced to condemn without inquiry into actual competitive harms.

**[12]** Second, the RSP differs from the profit-pooling arrangement condemned in *Citizen Publishing* in that it did not include all of the grocers operating in the region. In *Citizen Publishing*, the only two daily newspapers in Tucson agreed to pool profits pursuant to an inflexible ratio. 394 U.S. at 134-35. As California concedes, the combined sales of the grocers that were party to the RSP accounted for between 54.4% and 65.1% of the grocery market in the Los Angeles-Long Beach metropolitan area, and between 67.1% and 76.0% of the grocery market in the San Diego metropolitan area. While their collective market share was significant, the grocers still faced competition from other retailers such as Stater Brothers, Trader Joe's, Costco, and Whole Foods. Given the presence of these competitors in the market, there is a significant probability that the grocers retained incentives to continue—or even to increase—discounting and advertising of grocery products to prevent the loss of customers and profits during the strike period, to gain new customers if possible, and to maximize profitability and market share after the strike.

**[13]** Because the RSP was an agreement among some, but not all, of the competitors in the relevant market, and because by its terms the RSP had a limited and indefinite duration, it evades any "easy label" of "profit-pooling" and cannot sensibly be grouped together with or analogized to the very different arrangement condemned in *Citizen Publishing*.[15] *See*

---

[15]California offers a series of cases in addition to *Citizen Publishing* in an effort to demonstrate that profit-pooling arrangements have long been condemned as per se illegal. *See, e.g., United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 149 (1948) (holding that an agreement among five producers of motion pictures and their affiliates to share profits according to prearranged percentages was anticompetitive); *N. Sec. Co. v. United States*, 193 U.S. 197 (1904) (invalidating an agreement among stockholders in competing interstate railway companies to form one corporation with a controlling interest in the stock of each railway); *Chi., M. & St. P. Ry. Co. v. Wabash, St. L. & P. Ry. Co.*, 61 F. 993 (8th Cir. 1894) (invalidating an agreement among seven competing railroad companies to,

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 8-10 (1979); *United States v. Topco Assocs.*, 405 U.S. 596, 607-08 (1972) ("It is only after considerable experience with certain business relationships that courts classify them as per se violations of the Sherman Act."). A restraint of this nature has not undergone the kind of careful judicial scrutiny that would support the application of a per se rule. *See Topco Assocs., Inc.*, 405 U.S. at 607-08; *Metro Indus., Inc. v. Sammi Corp.*, 82 F.3d 839, 844 (9th Cir. 1996). Quite apart from the lack of judicial experience with a restraint of this nature, we conclude that the application of a per se rule is not warranted in this case because the practice of temporary revenue sharing during the duration of a labor dispute among some competitors within a market does not "facially appear[ ] to be one that would always or almost always tend to restrict competition and decrease output." *Broad. Music*, 441 U.S. at 19-20. In light of its particular features and context, the RSP is " 'not a naked restraint of trade with no purpose except stifling of competition.' " *Id.* at 20 (brackets omitted) (quoting *White Motor Co. v. United States*, 372 U.S. 253, 263 (1963)).

## 2. Market Allocation

We also reject California's attempt to characterize the RSP as a market-allocation agreement. California correctly notes that market-allocation agreements among competitors at the same market level are per se antitrust violations. *See United States v. Brown*, 936 F.2d 1042, 1045 (9th Cir. 1991). "Clas-

---

among other things, pool gross earnings for a period of twenty-five years); *Anderson v. Jett*, 12 S.W. 670 (Ky. 1889) (voiding a multi-year arrangement between rival steamboat owners to end their rivalry by sharing profits according to fixed percentages). None of these cases, alone or in combination, establishes sufficient judicial experience with a revenue sharing agreement of limited duration, among some competitors in a market, so as to permit per se treatment of the RSP. The fundamental economics of the firms and the public interest do not require per se prohibitory treatment of the challenged practice during a labor dispute.

sic" horizontal market division agreements are ones in which "competitors at the same level agree to divide up the market for a given product." *Metro Indus.*, 82 F.3d at 844. But where, as here, "the conduct at issue is not a garden-variety horizontal division of a market, we have eschewed a *per se* rule and instead have utilized rule of reason analysis." *Id.* California argues that the RSP "mirrors" market-allocation agreements because it divides up the Southern California market according to the participants' relative market shares. But California concedes that the RSP did not "prevent any Defendant from actually making sales" to consumers. California does not assert that the RSP restricted customers from patronizing certain grocers. Moreover, the agreement did not prevent the grocers from selling any particular products, or limit the grocers to a particular set of customers or geographic regions. The RSP cannot be characterized as a per se illegal market-allocation agreement.

## C.   "Quick Look"

We next address whether summary condemnation of the RSP on a truncated rule of reason or "quick look" is or is not correct. We conclude that a "quick look" conclusion of antitrust illegality is here inappropriate. This is so for many of the same reasons that per se treatment is not correct. The unique features of the arrangement among the grocers—its limited duration and the existence of other significant external competitors in the market—and the uncertain effect these features had on the grocers' competitive behavior and incentives during the revenue-sharing period render any anticompetitive effects of the RSP not obvious.

To reach a confident conclusion on the anticompetitive effects of the RSP, further development of the record is required. One might want to permit expert testimony and examine facts about the degree to which the challenged revenue-sharing agreement may have suppressed incentives of the grocers to discount and otherwise compete for customers.

One might want to have an understanding of the market impact of other competitors, not in the defendant group, whose pricing and terms of sale would have to be taken into account in a competitive market. It might be helpful to have an understanding whether other competitors were waiting in the wings to exploit any anticompetitive market by their entry, whether these potential new competitors were overseas, or in other regions of the United States, or were skilled in the developing concept of internet marketing of groceries or other novel techniques that might impose market pressures. Any of these inquiries might inform an evaluation whether, during the relevant period of its operation, the revenue-sharing provision had any anticompetitive effect. On a "quick look," none of this can be ascertained with reliability.[16]

The features of the RSP described in connection with the per se mode of analysis not only separate it from traditional per se illegal categories of restraints and prevent characterization as a "naked" restraint on price or output, but they also raise sufficient doubt about the anticompetitive nature of the agreement such that detailed scrutiny is required to understand its effects. Because "empirical analysis is required to determine [the] challenged restraint's net competitive effect, neither a *per se* nor a quick-look approach is appropriate because those methods of analysis are reserved for practices that facially appear to be ones that would always or almost always tend to restrict competition and decrease output." *Salvino, Inc.*, 542 F.3d at 340 n.10. (Sotomayor, J., concurring) (internal quotation marks and brackets omitted).

[14] To use the "quick look" approach, we must first determine whether "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on custom-

---

[16]Also, if experts gave conflicting views on these subjects, and they were material to resolution, then the decision of the trier of fact might control the outcome.

CALIFORNIA v. SAFEWAY, INC.                    9313

ers and markets." *Cal. Dental Ass'n*, 526 U.S. at 770. Once it is established that the restraint is inherently suspect and the anticompetitive effects are easily ascertained, *id.*, then the burden shifts to the grocers to produce evidence of procompetitive justification or effects and thus demonstrate the need for more extensive market inquiry, *id.* at 775; *see also* XI Areeda & Hovenkamp ¶ 1914d, at 354-55. The features of the RSP— its limited, indefinite duration and the presence of other competitive firms in the market—strongly suggest that the agreement "might plausibly be thought to have a net procompetitive effect, or possibly no effect at all on competition."[17] *Cal. Dental Ass'n*, 526 U.S. at 771.

[15] "Where, as here, the circumstances of the restriction are somewhat complex, assumption alone will not do." *Id.* at 775 n.12. The particular features and context of the RSP are more than mere idiosyncracies: they warrant further development of evidence and more rigorous review. *See* XI Areeda & Hovenkamp ¶ 1911a, at 295. Because we cannot reach a confident conclusion that the principal tendency of the RSP is to restrict competition, truncated review is inappropriate.

Can it be successfully argued, to the contrary, that because the RSP reduces the monetary risks of lost sales to participating grocers during a whipsaw strike, it is irretrievably anticompetitive in effect? We conclude that such an argument fails. If a competitor finds itself the target of a strike, which would cause it to lose sales to other competitors, then revenue sharing provides some cushion from the damaging monetary impact of the strike. But it is by no means "obvious" that the grocers that entered into the RSP would be motivated to reduce their competition on price. Although the immediate

---

[17]The grocers argue that the RSP has procompetitive benefits in the form of lower prices for consumers as a result of the grocers' ability to negotiate a more favorable contract on labor costs. Because California has not met its burden to show that the RSP is obviously anticompetitive, we need not address the grocers' procompetitive justifications.

monetary risk of losing sales to competitors during a labor strike is reduced by revenue sharing, the remaining risks are still such that a rational competitor would be expected to continue to compete vigorously. While it is true that the arrangement provides a cushion that may arguably affect incentives to compete, that alone, absent evidence of actual anticompetitive impact on pricing, is not sufficient for us to resolve the RSP issue on a "per se" or "quick look" or any other abbreviated basis.

[16] In light of the novel circumstances and uncertain economic effects of the RSP, we conclude that the district court correctly determined that it should follow the presumptive rule of reason. *See Cal. Dental Ass'n*, 526 U.S. at 781. Before the challenged revenue-sharing agreement technique is outlawed for use during a labor dispute, there should be open discovery and fair consideration of all factors relevant under the traditional rule of reason test, so as to determine if there are significant anticompetitive impacts and if so whether they outweigh any legitimate justifications. Application of the traditional rule of reason is not a simple matter, but it does permit the type of fundamental analysis appropriate for antitrust law evaluation, and it has stood the test of time.

## V.    Conclusion

We hold that the agreement between the grocers to share revenues for the duration of the strike period is not exempt from scrutiny under the Sherman Act, and that more than a "quick look" is required to ascertain its impact on competition in the Southern California grocery market. Given the limited judicial experience with revenue sharing for several months pending a labor dispute, we cannot say that the restraint's anticompetitive effects are "obvious" under a per se or quick-look approach. Although we conclude that summary condem-

nation is improper, we express no opinion on the legality of the arrangement under the rule of reason.[18] **AFFIRMED.**

---

FISHER, Circuit Judge, specially concurring:

I join Parts I-IV.A and V of the majority opinion, and concur in the outcome of Parts IV.B-C. I have strong doubts that the grocers' profit sharing agreement left them with an *undiminished* incentive to compete. Judge Reinhardt's dissent raises serious economic concerns about the effects of even a limited profit sharing agreement that the majority has not entirely refuted. Nonetheless, I am not confident that under the novel circumstances here an "enquiry meet for the case" can be something less than the presumptive standard — the rule of reason. *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999); *see Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006). Because I do not find that a "great likelihood of anticompetitive effects can *easily* be ascertained" on a quick look at the record before us, *Cal. Dental*, 526 U.S. at 770 (emphasis added), and because we lack the "considerable experience" necessary for per se analysis to say the economic impact of the grocers' agreement is "*immediately* obvious," *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886-87 (2007) (emphasis added) (quotation marks omitted), I align myself with the rule of reason outcome of the majority opinion.

---

[18]The ultimate competitive question may not be determined in this case because the State of California, to gain a final judgment that could be appealed at this time, has stipulated to foregoing its challenge to the RSP under the traditional rule of reason, contending instead that the RSP is invalid per se or on a "quick look."

Chief Judge KOZINSKI, with whom Judges TALLMAN and RAWLINSON join, dissenting in part:

By going out of its way to rule on the non-statutory labor exemption, the majority decides an important legal question that will have absolutely no effect on anyone involved in this case. We hold that there's no categorical antitrust violation under the quick look doctrine; nor can such a violation be established on remand, because California stipulated to dismissal if it didn't prevail under quick look. Since no antitrust violation can ever be established in this case, we have no occasion to decide whether any exemption from antitrust liability would apply. The majority's groundbreaking ruling on the labor exemption is thus very likely an advisory opinion and beyond the scope of our Article III jurisdiction. *See Thomas* v. *Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000) (en banc). Such dicta are particularly unwise when they are effectively insulated from Supreme Court review, as the grocers probably will have neither incentive nor standing to petition for certiorari.

Worse, I seriously doubt the majority decides the labor exemption issue correctly because it fails to grapple with the complex dynamics of this case. Had it done so, it would have realized that each and every factor the Supreme Court found relevant in *Brown* v. *Pro Football, Inc.*, 518 U.S. 231 (1996), supports finding the revenue-sharing provision (RSP) protected by the labor exemption. *Contra* maj. op. at 9302.

First, the RSP was inextricably intertwined with the collective bargaining process. *See Brown*, 518 U.S. at 250. *Contra* maj. op. at 9301-02. The grocers' agreement was a direct response to the union's anticipated use of whipsaw tactics. As courts have long recognized, whipsaw tactics are particularly devastating for employers, because

> the union strikes against one member of a multiemployer bargaining unit, but allows the other employ-

ers to continue operating in order to maximize the competitive pressure brought to bear upon the struck member . . . ; the idea is thereby to force each employer individually to capitulate through a series of such strikes, thus defeating their attempt to stand together.

*Int'l Bhd. of Boilermakers* v. *NLRB*, 858 F.2d 756, 760 (D.C. Cir. 1988).

The grocers here were legitimately concerned that the union would selectively strike and picket only one chain, diverting their customers to the others. The unions would thereby upset the prevailing competitive balance, crippling the target and ruining any chance of bargaining as a group. The grocers sought to blunt the disproportionate losses borne by the targeted chain by redistributing some of the windfall profits reaped by the others as a result of the union's tactics. The agreement was limited to the duration of the strike plus two weeks and became operative only if, and only to the extent, the union succeeded in redirecting consumers from the targeted store to other stores in the bargaining group. The RSP was thus narrowly tailored to counter the union's divide-and-conquer strategy. Its effect, moreover, was entirely pro-competitive: It helped keep all competitors in the market rather than letting one be wiped out by the strike.

As it turns out, the grocers were right to be concerned. Less than a week after their contracts expired, the unions struck, and Vons was the exclusive target. Per the grocers' Mutual Strike Assurance Agreement, Albertson's and Ralphs locked out their workers. The unions then picketed all three stores, but soon pulled pickets from Ralphs to zero in on the other chains. The unions' strategy was highly effective: Vons and Albertson's lost market share to Ralphs, as customers switched stores to avoid the picket lines. Some of these losses were offset by payments from Ralphs under the RSP, but many—such as the loss of long-time customers—were perma-

nent. The RSP was thus a limited, defensive tool that was directly related to the collective bargaining process.

The second *Brown* factor—that the practice is "unobjectionable as a matter of labor law and policy"—also points in favor of exemption. *Brown*, 518 U.S. at 238. *Contra* maj. op. at 9297-98. Although the NLRB has not had occasion to rule on the specific RSP at issue here, both the Supreme Court and the NLRB have generally sanctioned the use of economic weapons to combat whipsaw tactics. *See, e.g., NLRB* v. *Brown (Brown Food)*, 380 U.S. 278 (1965). The Supreme Court has recognized a particularly strong interest in "preserving the integrity of the multiemployer bargaining unit" against targeted attacks. *Brown*, 518 U.S. at 245 (quoting *Brown Food*, 380 U.S. at 289) (internal quotation mark omitted). Accordingly, the Court has approved many practices employers use to maintain a common front: They may, for example, agree to lock out all workers if any one of them is struck, *see NLRB* v. *Truck Drivers Local Union No. 449*, 353 U.S. 87, 89, 97 (1957), or hire temporary replacement workers, *see Brown Food*, 380 U.S. at 279-80. Revenue-sharing provisions that are designed to maintain cohesiveness in the teeth of union efforts to disrupt the bargaining group fit squarely within this category of accepted labor practices.

On the handful of occasions that courts have evaluated the legitimacy of revenue-sharing provisions, they have been upheld. In *Kennedy* v. *Long Island R.R.*, 319 F.2d 366 (2d Cir. 1963), the Second Circuit upheld the use of a strike insurance plan. Like the grocers here, the railroads were concerned that the union would engage in whipsaw tactics and wanted to spread the losses among employers. *Id.* at 368-69. The railroads contributed to an insurance fund that would pay out in the event of a strike. *Id.* As the proceeds were distributed, the fund was supplemented by further deposits from non-struck railroads. *Id.* The union sued, claiming the strike insurance fund violated both antitrust law and the railroad's duty to bargain in good faith. *Id.* at 368. The Second Circuit rejected

both claims, reasoning that "the strike insurance plan, far from constituting a violation of the railroad's duty to bargain in good faith, was an instrument of self-help properly employed in the process of collective bargaining." *Id.* at 371.

The D.C. Circuit reached a similar conclusion in *Air Line Pilots Ass'n Int'l* v. *Civil Aeronautics Bd.*, 502 F.2d 453 (D.C. Cir. 1974). There, six airlines entered into a "Mutual Aid Pact" to "soften the impact of strikes against individual companies." *Id.* at 455. The Mutual Aid Pact contained a provision, almost identical to the RSP, under which a "strikebound company received payments from other Pact members equal to their increase in revenues resulting from the strike." *Id.* As in *Kennedy*, the union claimed the revenue-sharing provision violated antitrust law and national labor policy. *Id.* The D.C. Circuit likewise rejected these claims, explaining that "[t]he national labor policy rests on the principle that parties should be free to marshall [sic] the economic resources at their disposal in the resolution of a labor dispute." *Id.* at 456. Although both of these cases were decided under the Railway Labor Act, their analysis was based on national labor policy and relied heavily on National Labor Relations Act cases. *See, e.g., id.* at 456 n.3 (relying on *NLRB* v. *Ins. Agents' Int'l Union*, 361 U.S. 477, 490 (1960)); *Kennedy*, 319 F.2d at 371 n.4 (relying on *Truck Drivers*, 353 U.S. 87). The majority dismisses these cases in a footnote, but they fatally undermine the majority's claim that the precaution adopted by the employers here is too novel and exotic to fall within the labor exemption.

Courts have also approved other strategies that redistribute the financial pain wrought by a strike. When unions engage in selective striking, for example, striking employees are often paid benefits to compensate for lost wages. *See Kennedy*, 319 F.2d at 372. Unions do this because it would be unfair to force one set of employees to bear the entire burden when the eventual benefit will inure to everyone. Strike benefits also strengthen the union's bargaining position by ensuring all

employees share the same incentives, and none will be driven by personal hardship to undermine the strike. Strike benefits are thus considered a legitimate economic weapon. *See Int'l Bhd. of Boilermakers*, 858 F.2d at 767. RSPs serve precisely the same purposes for employers bargaining as a group: Why should one employer alone bear the heavy cost of selective striking or picketing, when the eventual contract will bind the entire group? And why should unions be able to spread the burdens of a strike to reinforce their bargaining position, while employers can't?

When unions pay benefits to striking workers, their collusive actions are protected by statute. *See H. A. Artists & Assocs., Inc.* v. *Actors' Equity Ass'n*, 451 U.S. 704, 713-14 (1981). To protect the collective bargaining process, employers too must be allowed to share losses without fear of antitrust liability, which is the very point of the non-statutory labor exemption. *See Brown*, 518 U.S. at 237.

My colleagues reach the wrong conclusion because they misread *Brown*. The majority looks for some affirmative approval in labor law for the RSP, maj. op. at 9297-98, but that is far more than *Brown* calls for. *Brown* requires only that the conduct be "*unobjectionable* as a matter of labor law and policy." 518 U.S. at 238 (emphasis added). The very fact that the union did not challenge the RSP as an unfair labor practice, despite having raised a procedural dispute before the NLRB, itself is proof that the RSP is unobjectionable as a matter of labor policy. The second *Brown* factor is clearly satisfied.

The third *Brown* factor similarly favors exemption because the RSP concerned only parties with a direct stake in the outcome of the collective bargaining agreement. *See Brown*, 518 U.S. at 250. *Contra* maj. op. at 9301. Vons, Albertson's and Ralphs were part of the same multi-employer bargaining unit, and Food 4 Less's own contracts were set to expire just months later. Food 4 Less, standing alone, had no hope of

doing better against the union than Vons, Ralphs and Albertson's had done by working together. In all likelihood, the contract the union wrung from them would set the bar for Food 4 Less's own negotiations. Food 4 Less thus had a strong labor-related interest in standing shoulder-to-shoulder with the three other chains.

Equally important, Food 4 Less was required by its existing contract to contribute to employee benefits at a rate tied to that of Ralphs. As Ralphs's Vice President of Human Resources and Labor Relations explained, "the rate . . . for Food4Less employees' health and welfare [was] directly connected to the contract we . . . bargained." If the unions managed to extract more favorable benefits from Ralphs and the other chains as a result of the strike, Food 4 Less would be forced to provide more benefits for its own workers. It thus had a direct and immediate financial stake in the contract negotiations. The majority's claim that "the inclusion of [Food 4 Less] suggests that the conduct is not anchored in the collective-bargaining process," *id.* at 9301, is belied by the record.

The fourth factor—whether the conduct involved subject matter that the parties were required to negotiate collectively —simply doesn't apply to this case. *See Brown* at 250. In *Brown*, the Court had to decide whether the NFL's unilateral imposition of its last good faith salary offer was exempt from antitrust review. In such a case, it's relevant whether these substantive terms relate to "wages, hours, and working conditions," or whether the terms are unrelated to collective bargaining. *Id.* at 241; *compare id.* at 234 (agreement to set salaries is exempt), *with United Mine Workers* v. *Pennington*, 381 U.S. 657, 663 (1965) (agreement to set prices of goods is not exempt). Where the employer action at issue involves a procedural bargaining tactic, rather than a substantive term of the contract, it makes no sense to ask whether the tactic relates to "wages, hours, and working conditions." It never does. Yet procedural tactics go to the heart of the exemption's

purpose—to free from antitrust scrutiny employer actions that are "needed to make the collective-bargaining *process* work." *Brown*, 518 U.S. at 234 (emphasis added); *see also id.* at 247. A lockout, for example, is a bargaining tactic that has nothing to do with "wages, hours, and working conditions" yet is exempt from antitrust review. *See id.* at 245; *see also id.* at 254 (Stevens, J., dissenting); maj. op. at 9300. That the revenue-sharing provision—which is a procedural tactic designed to put pressure on the union during the course of negotiations—doesn't relate to a mandatory subject of collective bargaining is simply beside the point and cannot count against application of the labor exemption. *Contra* maj. op. at 9298-99.

Fifth, and finally, the conduct indisputably "took place during and immediately after a collective-bargaining negotiation." *Brown*, 518 U.S. at 250. The revenue-sharing provision clearly centered on the time period of the labor dispute, as it lasted only for the duration of the strike plus an additional two weeks. In its haste to condemn the RSP, the majority omits this factor from its discussion.

A fair reading of the RSP can leave no doubt that all the relevant *Brown* factors weigh heavily in favor of exempting the RSP from antitrust review. We are not dealing with employers who were using a labor dispute as a pretext to engage in price-fixing; it's perfectly clear that the employers were responding to union tactics in the course of a strike, and only to the degree the tactics were effectively deployed by the union. The majority's contrary dicta have no basis in the record, common sense or precedent.

Worst of all, we may never be able to correct this error. Strikes are costly endeavors for everyone involved, and introducing the additional threat of antitrust liability—with its protracted litigation, unpredictable rule of reason analysis and treble damages—will no doubt force employers to think twice before entering into a revenue-sharing agreement in the

future. Today's gratuitous decision thus has the unfortunate consequence of "forcing [employers] to choose their collective-bargaining responses in light of what they predict or fear antitrust courts, not labor law administrators, will eventually decide." *Brown*, 518 U.S. at 247. Should this fear prevent employers from entering into an RSP, we will have effectively usurped the role of the NLRB by dictating the tools that can and cannot be used in labor disputes. Because I find this result irreconcilable with *Brown*, inimical to sound labor policy, completely unnecessary to the resolution of this case and outside the scope of our constitutional authority, I dissent from Part III of the majority opinion.

REINHARDT, Circuit Judge, dissenting in part and concurring in part, joined by Judges SCHROEDER and GRABER:

Our antitrust law reflects Congress's judgment that, with rare and specific exceptions, free competition for customers among firms protects and benefits the public by increasing efficiency and output, lowering prices, and improving the quality of the products and services available.[1] No court has

---

[1]*See Apex Hosiery Co. v. Leader*, 310 U.S. 469, 493 (1940) ("The end sought [by Congress in passing the Sherman Act] was the prevention of restraints to free competition in business and commercial transactions which tended to restrict production, raise prices or otherwise control the market to the detriment of purchasers or consumers of goods and services, all of which had come to be regarded as a special form of public injury."); *see also Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993) ("The purpose of the [Sherman] Act is not to protect businesses from the working of the market; it is to protect the public from the failure of the market. The law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself. It does so not out of solicitude for private concerns but out of concern for the public interest."); *City of Lafayette v. La. Power & Light Co.*, 435 U.S. 389, 398 (1978) (In passing the Sherman Act, Congress "sought to establish a regime of competition as the fundamental principle governing commerce in this country.").

ever upheld an agreement among multiple employers to set prices or share profits.

In this case, the four largest supermarket chains in Southern California, controlling 60-70% of the market, entered into a profit sharing agreement according to a predetermined formula for the indeterminate period of an anticipated labor dispute and for a short period afterwards. The supermarkets contend that it is lawful for them to do so because, although profit sharing agreements are by their nature anticompetitive and thus constitute a restraint of trade, their particular profit sharing agreement differs in two respects from profit sharing agreements that have been held to violate the antitrust laws: first, the agreement was to last for only the limited duration of the strike, however long that might be; and, second, the four supermarkets control only a substantial majority but not 100% of the market.

The majority agrees with the supermarkets that these two factors make their profit sharing agreement sufficiently different from those in all the previously decided cases that, in order to determine whether their agreement has an anticompetitive effect, it is necessary to apply not just the fact-sensitive intermediate test that the Supreme Court has endorsed for assessing less complex restraints of trade, but the most rigorous and exhaustive "rule of reason" analysis that requires a full-scale duel of economic experts over complicated and sophisticated market issues. I disagree.

The profit sharing agreement's indeterminate duration and less-than-total domination of the market are immaterial to an analysis of an agreement that inherently violates the antitrust laws. The correct method of analysis of a profit sharing agreement is either the simple per se rule or another intermediate standard such as quick look, by which we examine the anticompetitive effects of an agreement according to its particular circumstances, details, and logic, in light of the generally applicable antitrust law, fundamental principles of economics,

and clear experience of the market. *See Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 780-81 (1999). Because a battle royale of economic experts in the courts is unnecessary and because defendants' profit sharing agreement can readily be determined to violate the antitrust laws under the intermediate standard, I would reverse the district court's denial of summary judgment to plaintiff and hold that the profit sharing agreement violates section 1 of the Sherman Act. Accordingly, I dissent in part.[2]

I.

Section 1 of the Sherman Act bans agreements or combinations that act as unreasonable restraints on interstate commerce. *See State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997). Defendants entered into an agreement to share profits. Such agreements have traditionally been held to be anticompetitive because they remove the incentive to engage in competitive behavior. Defendants have two principal contentions as to why their profit sharing agreement is different: first, that their profit sharing is for a limited, if indefinite period; and, second, that their agreement does not include 100% of the participants in the market. They also contend, by way of response to plaintiff's prima facie case, that their profit sharing agreement helps them to prevail in the labor dispute and thereby to achieve their goal of lowering wages and benefits paid to their employees. Doing so, defendants allege, aids competition in the Southern California market.

It is evident from a rudimentary knowledge of economics, as well as from a reading of the case law, that neither the agreement's limited duration nor its failure to include the

---

[2]Defendants also contend that their profit sharing agreement is exempt from the antitrust laws because they employ it as a bargaining tactic in an anticipated labor dispute. The majority concludes that the profit sharing agreement does not qualify for the nonstatutory labor exemption and I agree. *See* Maj. Op. at 9289-9302.

fragmented group of other firms operating in the market could do more than *reduce* the ordinary anticompetitive effects of such agreements. Certainly these factors would not *eliminate* such effects. An analysis of the details, logic, and circumstances of the particular profit sharing agreement, including its relationship to the anticipated strike, confirms that conclusion. The agreement's effect is necessarily anticompetitive and, like any other profit sharing agreement of limited duration among firms that control well over a majority, but less than 100% of the market, the anticompetitive effects might be reduced to some extent but they certainly would not be eliminated.

### A.

The "presumptive or default," Maj. Op. at 9304, method of analysis for determining whether an agreement is an unreasonable restraint on trade such as violates section 1 of the Sherman Act is rule of reason review. In conducting that review, courts fully examine factors such as "specific information about the relevant business," "the restraint's history, nature, and effect," and "[w]hether the businesses involved have market power," with the purpose of "distinguish[ing] between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc*, 551 U.S. 877, 885-86 (2007) (internal quotation marks omitted).

Rule of reason review is data-intensive and, consequently, expensive for litigants; also, it consumes large amounts of court time and other resources. *See Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 343-44 & n.14 (1982). For these reasons, as well as to provide guidance to the business community, *see Cont'l T.V., Inc., v. GTE Sylvania Inc.*, 433 U.S. 36, 50 n.16 (1977), courts have developed summary methods of identifying section 1 violations in circumstances in which such violations are discernible without a full rule of reason

analysis: namely, per se review and quick look review. Per se analysis examines whether prior judicial experience with the type of restraint at issue is sufficient to allow a determination that it would always or almost always tend to restrict competition and decrease output. *See Leegin*, 551 U.S. at 886. The focus of the inquiry is on accumulated data from prior decisions: an agreement may be declared unlawful with no further analysis, simply by virtue of its being of a type that courts have previously determined to have "manifestly anticompetitive effects," but no "redeeming virtue." *Id.* (internal quotation marks omitted).

In contrast, an arrangement violates section 1 under a quick look approach when "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." *Cal. Dental Ass'n v. FTC*, 526 U.S. at 770. Quick look review is not necessarily based on a history of rule of reason adjudications; rather, it asks whether a "great likelihood of anticompetitive effects can easily be ascertained" by examining the restraint and considering the defendants' justifications for it. *See id.*; *see also* XI Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1911a, at 296-97 (2d. ed. 2004 Supp.) (Quick look review "is usually best reserved for circumstances where the restraint is sufficiently threatening to place it presumptively in the *per se* class, but lack of judicial experience requires at least some consideration of proffered defenses or justifications." (footnote omitted)).[3]

---

[3]Inherent in the summary nature of quick look and per se analysis is the possibility that a restraint that would survive a full rule of reason analysis in a particular case will nonetheless be invalidated: "For the sake of business certainty and litigation efficiency, we have tolerated the invalidation of some agreements that a fullblown inquiry might have proved to be reasonable." *Maricopa Cnty. Med.*, 457 U.S. at 344. The ultimate inquiry in both analyses is establishing a sufficiently high likelihood of anticompetitive effect to justify foreclosing, in the name of certainty and efficiency

California contends that defendants' profit sharing arrangement violates section 1 under either the per se rule or quick look review. Its assertion that the agreement strongly resembles arrangements that prior cases have found violative of section 1 is correct, although the particular circumstances of the restraint in question do differ from the circumstances relating to the profit sharing arrangements examined in those earlier cases. It is unnecessary, however, to determine whether such differences are sufficiently material that we should refrain from concluding that defendants' profit sharing agreement was illegal under a strict per se analysis, because the agreement was plainly illegal under a quick look or, more accurately, a combined or mixed form of intermediate review. "[A] great likelihood" that defendants' profit sharing arrangement produced "anticompetitive effects" is manifest, *Cal. Dental Ass'n*, 526 U.S. at 770, and defendants offer no plausible procompetitive benefits that would overcome or neutralize those effects so as to require full rule of reason analysis.

Although the parties briefed the case on the traditional view that the two summary forms of review are separate and unrelated, and the questions they posed are here discussed separately to some extent, the lawfulness of the agreement is best analyzed in light of the Supreme Court's recent explanation that "our categories of analysis of anticompetitive effect are less fixed than terms like 'per se,' 'quick look,' and 'rule of reason' tend to make them appear." *Id.* at 779. According to Justice Souter, writing for the Court, "[w]hat is required . . . is an enquiry meet for the case, looking to the circumstances,

---

goals, the possibility that a more in depth review would reveal that a restraint was on balance benign or even beneficial. *See Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 340 n.10 (2d Cir. 2008) (Sotomayor, J., concurring in the judgment) (quick look and per se "methods of analysis are reserved for practices that 'facially appear [ ] to be one[s] that would always or almost always tend to restrict competition and decrease output.' " (alterations in original) (quoting *Broad. Music, Inc. v. CBS*, 441 U.S. 1, 19-20 (1979)).

details, and logic of a restraint," with the object of determining "whether the experience of the market has been so clear, or necessarily will be, that a confident conclusion" can be drawn that the "principal tendency" of an agreement is anticompetitive. *Id.* at 780. I would follow the Court's suggestion and would apply a mixed or blended approach, engaging in an analysis "meet for the case" — here, an analysis that compels the confident conclusion that the principal tendency of defendants' agreement is anticompetitive and that the agreement thus violates section 1 of the Sherman Act. On the basis of that intermediate analysis, I would reverse the district court and hold that defendants' profit sharing arrangement is unlawful.

### B.

I first discuss the applicability of strict per se analysis. "The rationale of the rule of per se illegality depends on the premise[ ] that . . . judicial experience with a particular class of restraints shows that virtually all restraints in that class operate so as to reduce output or increase price." XI Areeda & Hovenkamp ¶ 1911a, at 295. Accordingly, application of the per se rule is limited to restraints of a type that courts' "considerable experience" has revealed to have "manifestly anticompetitive effects," and no "redeeming virtue," such that judges can "predict with confidence that it would be invalidated in all or almost all instances under the rule of reason." *Leegin*, 551 U.S. at 886-87. Thus, the question for per se analysis is whether defendants' agreement is of a type that courts have previously determined to have such pernicious effects. California argues that defendants' profit sharing arrangement was both a profit pooling agreement and a market allocation agreement, each of which courts have determined to be subject to per se invalidation. As I explain below, the contention that defendants' agreement was a market allocation agreement is without merit. The question whether it was a profit sharing agreement sufficiently similar to the profit sharing agreements that courts have previously examined and invalidated is much

closer. Below, I discuss the relationship between defendants'
profit sharing agreement and profit sharing agreements invali-
dated in prior cases but, ultimately, do not determine whether
defendants' agreement constituted a per se violation of the
Sherman Act. Rather, as I explain below, in determining that
it was unlawful, I would apply a per se-plus or a quick look-
minus analysis, a combined or mixed approach, somewhere
between pure per se and pure quick look, along the meet-for-
the-case lines suggested by the Court in *California Dental
Association*.

<div align="center">1.</div>

   California contends that defendants' profit sharing agree-
ment is essentially identical to those profit pooling and shar-
ing schemes that the Supreme Court has found to be per se
violations of section 1. *See Citizen Publ'g Co. v. United
States*, 394 U.S. 131, 135 (1969) ("Pooling of profits pursuant
to an inflexible ratio at least reduces incentives to compete for
circulation and advertising revenues and runs afoul of the
Sherman Act."); *see also United States v. Paramount Pictures
Inc.*, 334 U.S. 131, 149 (1948) (profit sharing agreement a
"bald effort[ ] to substitute monopoly for competition"); *N.
Sec. Co. v. United States*, 193 U.S. 197 (1904); *Chicago, M
& St. P. Ry. Co. v. Wabash, St. L. & P. Ry. Co.*, 61 F. 993 (8th
Cir. 1894); *Anderson v. Jett*, 12 S.W. 670 (Ky. 1889).

   Profit pooling or profit sharing arrangements eliminate
incentives to compete for customers along every dimension:
there is little purpose in attempting to attract another firm's
customers by lowering prices, improving quality, or taking
any other measure if the profits earned from those new cus-
tomers would be placed in a common pool in which the other
firm is a participant, and the proceeds distributed in the same
way no matter which participant in the profit pool generated
the underlying sales, or if transfer payments are made
between firms to achieve the same effect. *See N. Sec. Co.*, 193
U.S. at 328 (pooling profits "destroy[s] every motive for com-

petition between . . . natural competitors."); *Chicago, M. & St. P. Ry. Co.*, 61 F. at 997 (a profit sharing agreement by which railroads that carried less than a predetermined share of freight were compensated by other railroads such that their share of total revenues remained constant had "[t]he necessary and inevitable result of . . . foster[ing] and creat[ing] poorer service and higher rates"). The Sherman Act was intended to curb just such restraints on competition.

Defendants contend that there are three ways in which their scheme differs from the profit pooling or sharing that was held unlawful in prior cases. The first of these contentions is meritless. Defendants argue that, unlike the agreements in prior cases, which provided that the parties would share all profits, their agreement provides that any party that experiences an increase in relative market share would share with the others only 15% of its increase in relative revenue, and that the sums to be redistributed are less than all of the profits earned on those increased revenues. There is no question, however, that the 15% figure was defendants' estimate of the total additional profits to be earned as a result of any increase in relative market share while the profit sharing agreement was in effect. This plan to share all the additional profits earned is what is relevant. Richard Cox, a vice president of Safeway who helped to draft the agreement, stated in his deposition that the 15% was meant to represent accurately the *profit* that a chain would collect on increased revenues that were earned without an increase in fixed costs. Defendants do not dispute the accuracy of his testimony. Their proffer is the statement of their expert witness, who conjectured that it was "plausible" and "likely" that incremental profits were greater than 15% of revenues, but admitted that he had done no analysis of incremental profitability from the data.[4] Defendants

---

[4]I note that the district court should not have accorded the expert's statement any weight given its explicitly speculative nature. "An expert's opinions that are without factual basis and are based on speculation or conjecture" are inadmissible at trial and are "inappropriate material for consideration on a motion for summary judgment." *Major League Baseball*, 542 F.3d at 311.

cannot force the expense of full rule-of-reason litigation on courts and opposing parties simply by speculating that they may have gotten their arithmetic wrong when they were setting up their scheme to share profits; their plan to share profits is sufficient, whether or not the scheme as implemented achieved that objective to perfection.

Defendants' other two contentions, however, raise sufficient question as to whether their profit sharing scheme should be invalidated under a strict per se approach or whether additional analysis of the agreement and its likely effects would be beneficial, and whether the court should proceed to a quick look approach or, more accurately, to a mixture or combination of the two approaches.

First, while profit sharing agreements in previous cases were to last for decades or permanently, defendants' scheme is scheduled to last only for the period of the labor dispute, plus two additional weeks. *See Citizen Publ'g*, 394 U.S. at 133 (fifty-year agreement); *Paramount Pictures*, 334 U.S. at 131 (considering apparently permanent profit sharing agreements); *N. Sec. Co.*, 193 U.S. at 197 (finding illegal an apparently permanent profit pooling arrangement); *Chicago, M. & St. P. Ry. Co.*, 61 F. at 996 ("The contract was to continue for 25 years."). That the term of the scheme could expire in a relatively short period — anywhere from a few weeks to a year or more, depending on the length of the strike — is no defense if the scheme is anticompetitive. Section 1 of the Sherman Act proscribes all anticompetitive agreements, regardless of their duration: neither the text of the statute nor the case law contains an exception for anticompetitive agreements that last for less than a fixed period of substantial length. However, defendants' contention is that no anticompetitive effects could result from their arrangement, because the potentially short term of the profit sharing leaves them with sufficient incentive to compete for customers, whose allegiance might be retained after the end of the strike. Because courts have not previously considered profit sharing arrange-

ments of a potentially very short duration, the court probably should not simply apply a pure per se analysis to defendants' arrangement.

Second, unlike firms in most of the prior profit sharing cases, which were the only firms of their kind operating in the relevant market, defendants were not the only supermarkets in the affected areas. *See, e.g., Citizen Publ'g*, 394 U.S. at 133 (the defendants were the only general distribution newspapers in Tucson). California is correct that a profit sharing plan need not cover the entire market in order to affect competition. However, it is incorrect that the distinction between a profit sharing plan that covers the entire market and one that does not is unworthy of *any* consideration before we make a determination whether anticompetitive effects will result from an agreement. As with the previous distinction, courts have not explored the question sufficiently to allow certitude with the application of a strict per se approach here.

2.

California next contends that the profit sharing agreement was a market allocation agreement that allocated the Southern California grocery market according to defendants' historic shares of that market. Market allocation agreements are "classic per se antitrust violation[s]." *See United States v. Brown*, 936 F.2d 1042, 1045 (9th Cir. 1991). Courts have treated as unlawful market allocation agreements assigning particular territories to particular vendors, *see Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49-50 (1990) (per curiam); *United States v. Topco Assocs., Inc.*, 405 U.S. 596 (1972), assigning certain customers to certain vendors, *see White Motor Co. v. United States.*, 372 U.S. 253 (1963), and capping total sales volume of the market and assigning participants fixed shares of that total volume, *see United States v. Andreas*, 216 F.3d 645, 666-68 (7th Cir. 2000). The common thread to these decisions is that in allocating the market, firms ensure that customers

attempting to purchase products in the relevant market will have fewer firms competing for their business.

In contrast to the agreements at issue in the market allocation cases, however, defendants' agreement is not alleged to have decreased the number of supermarkets available to customers. Rather, California alleged that the agreement simply reduced the competition for customers among the defendant businesses. Thus, it does not allege a market allocation claim appropriate for either strict per se analysis or a mixed or blended approach, and we need proceed no further with that question. In view of the above, I would decline to hold that California prevails on a strict per se theory.

## C.

Turning from a strict per se to a quick look, or rather, in this case, to a combined or mixed approach, fair analysis requires careful inquiry. An agreement violates section 1 of the Sherman Act under a quick look analysis when "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." *Cal. Dental Ass'n*, 526 U.S. at 770. If so, the burden of proof shifts to the defendant "to show empirical evidence of procompetitive effects." *See id.* at 775 n.12; XI Areeda & Hovenkamp ¶ 1914d(1) at 355. Accordingly, a court seeking to determine on a "quick look" whether an arrangement violates section 1 must first determine whether it can "easily . . . ascertain[ ]" a "great likelihood of anticompetitive effects," *Cal. Dental Ass'n*, 526 U.S. at 770, and, if so, whether any such effects are neutralized or outweighed by procompetitive benefits.

Taking into account the Supreme Court's recent explanation that the "categories of analysis of anticompetitive effect are less fixed than terms like '*per se*,' 'quick look,' and 'rule of reason' tend to make them appear," and that rather than drawing "categorical line[s]" between restraints, a court

reviewing an agreement that is alleged to violate section 1 must conduct "an enquiry meet for the case," *see id.* at 779-81, a court in a case like that before us should look to the history of judicial experience with profit sharing agreements, apply rudimentary economic principles to the meaning and effects of the particular agreement in question, and carefully analyze the circumstances, details, and logic of the agreement in order to determine the likelihood of anticompetitive effects. Then it must consider the purported procompetitive effects that the defendants suggest are sufficient to overcome any anticompetitive effects of the agreement. The question, then, under the combined or mixed approach is whether, after conducting the requisite review and analysis the court can reach a "confident conclusion [that] the principal tendency" of the agreement is to restrict competition. *See id.* at 781.

Significantly, a "confident conclusion" does not always prove ultimately correct. *See supra* note 3. Rather, it represents a tool of judicial economy designed to save the litigants and the courts a considerable investment of time and money, which in the balance is to the benefit of all. That occasionally we might be wrong is a price that it is long established that society is willing to pay. In fact, some of the conclusions of which our leading economic experts have been confident have turned out to be incorrect. For example, Alan Greenspan, appointed and then reappointed Chairman of the Federal Reserve for five terms by four different Presidents, recently admitted to a significant flaw in the ideology that caused him to support and implement policies of financial deregulation: "We made a mistake in presuming that the self-interest of organizations, specifically banks and others, were such that they were best capable of protecting their own shareholders." *See* Paul M. Barrett, *While Regulators Slept*, N.Y. Times, Aug. 6, 2009, at BR 10. And Judge Richard Posner, a highly respected jurist and a leading economics expert, has recently expressed his admiration for Keynesian economics, reversing a lifetime of reliance on the Chicago School's approach. *See* John Cassidy, *Letter from Chicago*, The New Yorker, Jan. 11,

2010, at 28. Thus, a "confident conclusion" for purposes of quick look and other limited approaches means, at most, a reasonably confident conclusion a court may reach that, on some occasions, may prove to be incorrect. Equally incorrect, however, may be a conclusion reached by a body of economics experts after years of study or even a verdict reached by a jury following a full-scale trial with the most careful and thorough development of a full evidentiary record with the aid of the most experienced antitrust lawyers and expert witnesses.

Here, I am confident in my conclusion that defendants' profit sharing agreement creates a "great likelihood of anti-competitive effects," and that such effects are not outweighed or neutralized by any plausible procompetitive benefits. I am confident that neither the duration of the agreement nor the fact that defendants have less than a 100% share of the market significantly affects the anticompetitive "principal tendency" of the profit sharing agreement. In reaching this conclusion, I have considered whether, because the objective of the agreement was to affect the outcome of a labor dispute and to bring about a reduction in labor costs, my conclusion should be altered. My answer is a definite and unqualified "No." Finally, although the parties introduced some evidence to support their respective positions, I do not rely on such empirical proof in reaching this conclusion; I note, however, that to the extent that it is relevant, the evidence appears either to support the conclusion that I would reach or, alternatively, to add little or nothing of any significance to my analysis. Finally, although some confident conclusions may ultimately prove to be incorrect, I am confident that this one will not.

1.

a.

Defendants entered into an agreement under which they shared profits with one another according to their historic

shares of the market. As discussed above, the only factors distinguishing defendants' arrangement from a profit sharing agreement that would have constituted a per se violation of section 1 of the Sherman Act are (1) the presence in Southern California of a fragmented cluster of smaller markets with a residual minority of the market share, and (2) the indefinite, if limited, term of the agreement. Absent those features, defendants' scheme would simply constitute a profit pooling or sharing arrangement akin to the ones held violative of section 1 in earlier cases, and there would be no question that the agreement creates a "great likelihood of anticompetitive effects." This is apparent from the fact that when firms sharing profits are the only firms in a market, each will receive the same portion of the total profits whether it cuts prices, invests in improving its products or services, or does nothing to win customers from the other firms; the result of this lack of competitive pressure is the high likelihood that prices rise towards monopoly levels or fail to fall with the same effect. It is for these reasons that the Supreme Court has said that "[p]ooling of profits pursuant to an inflexible ratio" is a "§ 1 violation[ ]" that is "plain beyond peradventure." *Citizen Publ'g*, 394 U.S. at 135-36.[5]

---

[5]This effect has been well understood for many years, and was ably explained well over a hundred years ago by the Kentucky Court of Appeal, then the highest court in that state, in the following discussion of a profit sharing arrangement between two steamboat companies:

> There was a strong stimulation to increase the net profits by means other than that of popular favor springing out of efficient steamboat facilities and close attention to the business of shipping for reasonable charges and courteous attention to passengers at reasonable fare. . . . It is the competition, or fear of competition, that makes these carriers efficient, attentive, polite, and reasonable in charges. Remove competition, or the fear of it, and they become extortionate, inattentive, impolite, and negligent. . . . It is said that neither was bound to charge the same as the other. That is true; but either could extort with impunity, and the other would be an equal recipient of the fruit of the extortion. . . . It is true that their contract did not, in so many words, bind

The well-recognized effects of profit sharing set forth above help to guide the discussion in the case before us: that discussion starts from the premise that the sharing of profits among competitors ordinarily has substantial adverse effects on competition. Next is the consideration whether either of the aspects of the agreement before us that defendants assert materially distinguish it from ordinary profit sharing arrangements would, in light of the "circumstances, logic, and details of the restraint," preclude that agreement from having the anticompetitive effect that would otherwise occur.

In an ordinary period in which no profit sharing arrangement is in effect, defendants compete with one another, and with a smaller set of other unrelated grocers, for customers and sales. The fruits of successful competition might accrue both in the present, as a supermarket makes sales in the current period, and in the future, as customers won or retained through such competition return to the store to make more purchases. Defendants contend that a profit sharing agreement of limited duration, restricted to the dominant market participants, does nothing to alter the ordinary incentive structure, and that the competitive pressure while such a profit sharing agreement is in effect is no less than the competitive pressure that would occur in the absence of such an agreement. Having

---

them to any given charges; but it made it to the interest of each, not only to charge, but to encourage and sustain the other in charges that would amount to confiscation. . . . This combination was more than that of a combination not to take freight or passengers at less than certain prices. In such case, the combiners have to furnish adequate means of transportation, and efficient and polite officers, and confine themselves as nearly as possible to the sum agreed upon, in order to secure the trade, or a reasonable portion of it; but here, by reason of the agreement, . . . . [i]nefficient means of transportation [and] unskilled or inattentive officials[ ] are no drawback to either boat. Its share of the profits come[s] notwithstanding.

*Anderson v. Jett*, 12 S.W. 670, 671 (Ky. 1889).

reviewed their contentions and analyzed all the plausible effects of the agreement, I disagree. I am confident in the conclusion that defendants' profit sharing arrangement removes, or at the least significantly reduces, a key source of competitive pressure—competition among defendants for sales to be made during the agreement period—without there being any countervailing pressure sufficient to neutralize or overcome the overwhelming likelihood of anticompetitive effects. Although it is plausible that the two differences on which defendants rely will serve to reduce the competitive pressures to a lesser extent than would a long-term agreement among competitors who control 100% of the market, it is evident that the lessening of the reduction in competitive pressure will be one of degree only, and that there is no likelihood whatsoever that the anticompetitive effects of a profit sharing agreement will be eliminated.

As already stated, when an arrangement redistributes all profits on current sales among a group of competitors according to a predetermined ratio, as defendants' arrangement does, there is little reason for the individual firms within the group to compete with one another for those sales. Thus, the analysis begins with the determination that there is a high likelihood that defendants' agreement has a substantial negative effect on their incentive to compete with one another for customers in order to make sales during the period in which the agreement is in effect. Defendants nonetheless contend that there is an incentive to compete with one another for customers during the profit sharing period, pointing to the indefinite duration of the agreement and to the possibility that customers who are won or retained through competition during that period will remain as customers after the agreement ends. Additionally, they contend that the other firms in the market will exert competitive pressure on them sufficient to make up for any loss of competitive pressure among themselves. These contentions must be examined for their validity during the period of limited duration in general, and then in light of

whether the particular circumstance of the agreement — an impending labor strike — alters that general analysis.

First, for a profit sharing agreement of limited but indefinite duration, the incentive to compete for sales and profits that would occur at some future time would necessarily be less than the ordinary incentive to compete by seeking to attract customers who will patronize the stores starting immediately and will continue to patronize them in the future as well. The supermarkets assert that the profit sharing arrangement does not reduce their incentive to engage in competitive behavior because customers might buy goods at some indefinite point in the future in which profits would not be shared. Any such future incentives are at best speculative and must be heavily discounted. The sales that would produce those future profits might not be made for six months, or a year, or more. By paying money now for sales that would occur, if at all, only in the indefinite future, the defendants would incur the ordinary costs of obtaining customers without receiving the ordinary benefits that would accrue. Whatever incentive might remain, with the agreement in place, for the supermarkets to compete for customer purchases in the future is considerably outweighed by the incentives that the agreement reduces to compete for purchases today. Viewing matters most favorably to defendants, the anticompetitive effects resulting from an agreement of limited, if indefinite, duration might be diminished, but certainly would not be eliminated. There can be no question whatsoever that the profit sharing agreement of indefinite duration would at least to some degree reduce defendants' incentive to compete.

With defendants exerting reduced competitive pressure on one another during the profit sharing period, competition from firms not included in the profit sharing agreement would have to result in an extraordinary amount of increased competitive pressure to make up for the loss of the paramount pressure that defendants ordinarily exert on each other. This too is

highly unlikely.[6] During the profit sharing period, defendants controlled at least 60% of the Los Angeles-Long Beach portion of the Southern California market and at least 70% of the San Diego portion, and between them operated more than 950 stores in the areas affected by the agreement, a combined presence sufficient to suggest an ability to significantly affect prices and other outcomes in the Southern California market.[7]

---

[6] IIA Areeda & Hovenkamp ¶ 391b(1) at 323 ("[W]hether a price-fixing conspiracy among sellers involves everyone or only a dominant group, this business practice leads to overcharges that constitute antitrust injury. The same can be said for business practices that are economically equivalent — for example, agreements on market division, product quality, credit terms, and the like.").

[7] No precise standard exists for determining when a firm or a group of firms controls enough of a market that its actions might cause anticompetitive effects. However, the uncontested facts about defendants' share of the market and the fragmented nature of the rest of the market together appear to be sufficient to establish the monopoly power over the market required for a violation of section 2 of the Sherman Act, a higher standard than is required to find that a firm or firms had sufficient power in the market that their actions could violate section 1. See Am. Tobacco Co. v. United States, 328 U.S. 781, 797 (1946) (a firm with over two-thirds of the market is a monopoly); Syufy Enters. v. Am. Multicinema, Inc., 793 F.2d 990, 995-1000 (9th Cir. 1986) (60-69% market share accompanied by a fragmentation of competition sufficient to show "monopoly power" over a market as required for violations of section 2 of the Sherman Act); Pac. Coast Agric. Exp. Ass'n v. Sunkist Growers, Inc., 526 F.2d 1196, 1204 (9th Cir. 1975) (45-70% share of the market sufficient to show monopoly power where no other competitor had more than a 12% share); Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 481 (1992) ("Monopoly power under § 2 requires, of course, something greater than market power under § 1."); cf. FTC v. Staples, 970 F. Supp 1066 (1997) (applying 1982 Merger Guidelines); Costco Wholesale Corp. v. Maleng, 522 F.3d 874, 896 (9th Cir. 2008) ("When firms in a market are able to coordinate their pricing and production activities, they can increase their collective profits and reduce consumer welfare by raising price and reducing output.") (citing George Stigler, A Theory of Oligopoly, 72 J. Pol. Econ. 44 (1964) (arguing that successful collusion requires firms to overcome particular market uncertainties; one of the key uncertainties is whether another firm will "cheat" its rivals by offering a lower price)); United States Energy Information Administration, World Crude Oil Production, 1960-2008, http://www.eia.doe.gov/aer/txt/ptb1105.html (last visited June 13, 2009) (during the 1970s OPEC never controlled more than 56% of the world oil market).

Defendants would be at least partially insulated from competition from other vendors by virtue of the many and varied locations of their stores, which for numerous customers would be far more convenient to patronize than the markets operated by the other vendors. Defendants also would be partially insulated from such competition by the inability of the other vendors to compete effectively as a result of brand recognition (and, indeed, customer awareness of their existence), limited facilities, contracts with suppliers and staffing commensurate with their limited historical role in the market; factors that would substantially curtail the ability of the other vendors to serve additional customers.[8] Those other vendors would no more be able to increase their capacity, staff, supplies, and brand recognition overnight than they could immediately open new locations convenient for defendants' customers. Nor would they be inclined to spend money to do so, knowing that the profit sharing agreement was of limited duration and, in fact, could end at any time. Finally, those other vendors are mainly independent of each other, consist of various types of markets, and would have neither the inclination nor the ability to agree on a uniform marketing policy that would significantly increase whatever competitive pressure the totality of those vendors ordinarily exerts on defendants. The overwhelming likelihood appears to be that, on the whole, smaller vendors would do little if anything to alter their marketing practices but rather would continue on their ordinary course, which would not serve to increase their economic pressure on defendants beyond what they ordinarily exert, or attract any

---

[8]Another consideration is that many alleged competitors' product offerings differ substantially from those of defendants, including box stores selling goods in bulk, such as Costco; retailers selling a limited selection of products and brands, such as Trader Joe's; and stores specializing in organic foods, such as Whole Foods. These markets are by their nature incapable of competing for much of the business of traditional supermarkets such as those operated by defendants. Notwithstanding these obvious facts, Costco, Trader Joe's, and Whole Foods were each alleged by defendants to have placed competitive pressure on them during the labor dispute.

large number of the customers that ordinarily patronize defendants.[9]

No one would dispute that the supermarkets' agreement had anticompetitive effects if they had simply agreed to fix equal prices and wages in order to eliminate competitive risk. The agreement in this case generated no less irreducibly anticompetitive effects, because the supermarkets' arrangement, like any other naked restraint on trade, reduced incentives to compete and yielded no plausible off-setting procompetitive or competition-neutralizing effects. A rudimentary knowledge of antitrust law dictates the conclusion that, if defendants in this case agreed to share profits for a limited period for their mutual economic benefit, there would be a violation of section 1 of the Sherman Act — at least in the absence of some extraordinary circumstance.

---

[9]Interestingly, economic theory suggests an even stronger negative effect on competition: it would appear to predict that, at least in the short run, in a market in which large, dominant firms have an agreement limiting competition amongst themselves, such an agreement will tend to increase the prices charged by those large firms, and that smaller firms, rather than increasing whatever economic pressure they ordinarily exert on those larger firms by charging the lower prices that would obtain under competitive conditions in order to attract the larger firms' customers, but will instead charge higher prices close to those being charged by the larger firms. *See* Herbert Hovenkamp, Federal Antitrust Policy § 4.1b (1994). Firms that pool profits are acting as a kind of cartel, and cartels that do not contain all the firms in the market are still able to raise prices above the prices that would be observed in a competitive marketplace, especially in a short term situation like that present here, in which the fixed costs of starting a supermarket (leases, employment and product purchasing contracts, signage, etc.) make it unlikely that new firms would enter the market to take advantage of the prices that are artificially high due to the cartel's collusive behavior. *See* Dennis W. Carlton & Jeffrey M. Perloff, *Modern Industrial Organization* 107-15, 122 (3d ed. 2000). Additionally, fixing market shares at precartel levels, as defendants essentially did here, is an "effective technique" for preventing cheating (in the form of competitive behavior) among members of the cartel. *See id.* at 139-40.

This brings us to defendants' contention that the threat of a strike, or a strike itself, constitutes such a circumstance. First, then, we must consider whether the profit sharing agreement loses its anticompetitive effects when it becomes operative during the course of a strike or labor dispute. There should be little difficulty in answering that question: the fact that defendants' agreement provides for profits to be shared only during a labor dispute and a brief ensuing period does not alter its inherently anticompetitive nature. Even during a strike period, a profit sharing agreement generates a "great likelihood of anticompetitive effects." For a vendor, the principal features of an employee strike are diminished consumer demand, as some customers choose not to cross the picket lines; a reduced workforce, because some workers at least are on strike; and a more urgent financial condition, as fixed costs remain at nonstrike levels, and revenues go down. While diminished demand, a reduced workforce, and a more urgent financial condition might affect defendants' competitive behavior during the strike, these potential effects would occur independent of the existence of a profit sharing agreement. None of these effects changes the basic impact of the agreement: defendants had little incentive to compete with one another while it was in effect because any profits earned on sales to another defendant's former customers would simply be redistributed back to the other defendants.[10]

---

[10]A more urgent financial condition would appear, if anything, to make it less likely that defendants would commit resources to competing with each other for customers from whom they would receive profits, if at all, only at some future date. To any extent that lower demand, lower supply, or strike-caused financial woes would prompt a defendant to try to win customers from vendors external to the agreement, the profit sharing agreement would, as in a nonstrike period, reduce its incentive for doing so: while the defendant would pay the entire cost (in advertising, improved quality, or discounting) of luring such customers, it would retain only a fraction of the benefit generated equal to its prestrike share of the market, and a substantial number of the new customers might well, for reasons discussed earlier, be lost by the time the labor dispute and profit sharing ended.

The profit sharing agreement itself would have an additional effect; it would cause defendants to compete even less during the strike period than they would were there no profit sharing agreement in effect at that time. Whatever the baseline circumstance as to competition in any given period, including a strike period, the existence of the profit sharing agreement results in a greater likelihood of reduced competition than there would otherwise be. That is the simple lesson that is apparent from a rudimentary knowledge of economics. Profit sharing necessarily serves to diminish the incentives to compete below whatever the level of competition would be in the absence of such an agreement; it is inherently, or as some courts have said, intuitively, anticompetitive and has the same, or a similar, effect on competition during a strike as it would have before the strike and after it ends. *See Cal. Dental Ass'n*, 526 U.S. at 780-81. The ultimate impact that the agreement has on pricing or output might be lower or higher depending on other circumstances, such as the existence of the anticipated labor dispute; however, whether greater or lesser, the net effect in all circumstances would be anticompetitive.

For the reasons explained above, I conclude that a "great likelihood of anticompetitive effects can easily be ascertained" by examining the agreement in light of prior cases, in light of its circumstances and details, as well as in light of logic and rudimentary principles of economics. Here, those anticompetitive effects are not only substantial, but they result from an agreement that removes fundamental incentives to engage in competition for an indefinite period. In short, neither the fact that there are a number of smaller companies in the market, the fact that the agreement is of an indefinite though limited duration, nor the fact that the agreement takes effect during a strike, warrants a departure from the well-established rule that profit sharing agreements are anticompetitive and violate section 1 of the Sherman Act.

b.

Defendants' fallback position is that the state lacks empirical evidence to demonstrate that the effects of the agreement were anticompetitive in practice. However, neither per se nor quick look review ordinarily requires empirical evidence of anticompetitive effects, nor is it required for the combined or mixed per se/quick look approach that should be applied here. As Professors Areeda and Hovenkamp explain, "[t]he main difference between . . . the 'quick look' approach and the rule of reason is that under the former the plaintiff's case does not ordinarily include proof of [market] power or anticompetitive effects." XI Areeda & Hovenkamp ¶ 1914d(1), at 355; *see also Cal. Dental Ass'n*, 526 U.S. at 779-80 (explaining that the "quality of proof required should vary with the circumstances;" that "naked restraint[s] on price and output need not be supported by a detailed market analysis in order to" move to the second step of the quick look analysis and "require" defendants to produce "some competitive justification"; and that not "every case attacking a less obviously anticompetitive restraint . . . is a candidate for plenary market examination") (internal quotation marks omitted)). So long as the anticompetitive nature of the likely effects of an agreement is, as a theoretical matter, "obvious," it is not necessary for a plaintiff to provide empirical evidence demonstrating anticompetitive consequences. *See Cal. Dental Ass'n*, 526 U.S. at 770-71; *see also NCAA v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 109-10 (1984). Such a rule is necessary in antitrust cases, where "reliable proof" of such effects might be "impossible to produce." XI Areeda & Hovenkamp ¶ 1901d at 207 (also noting that "in most [antitrust] cases . . . the impact on output," which in this case would be diminished sales at higher prices, "is assessed by inference from the nature of the agreement and surrounding circumstances rather than by actual empirical measurement").

This is a case in which reliable proof of anticompetitive effects or their absence through empirical evidence might be

difficult to obtain. Defendants' own expert explained that, because the profit sharing agreement took effect only during the labor dispute and both the agreement and the labor dispute might affect defendants' pricing decisions, the data required to best distinguish between the effects of the strike and those of the agreement and determine whether and how the agreement affected competition between defendants do not exist. *See* Declaration of Thomas R. McCarthy ¶ 47.

This is, more important, a case in which the anticompetitive nature of the restraint is obvious. As discussed above, by the terms of the agreement any defendant that earns profits above its historic market share is required to give those additional profits to the other defendants. Because a defendant may not retain any profits that it made from competing with the other defendants and receives a proportionate share of whatever profits those other defendants make from competing with it, the profit sharing agreement plainly reduces the competitive pressure among defendants for sales whenever it is in effect, during the strike or otherwise. To justify their conduct, defendants rely not on the neutral or positive effect on competition arising out of their agreement, but on other sources of competitive pressure—increased competition from other vendors and competition with one another for post-strike business. As explained above, it is wholly implausible that those factors would be sufficient to overcome the reduction in competitive pressure that necessarily results from the profit sharing agreement. Defendants' agreement plainly removes a significant source of competitive pressure without giving rise to any comparable counter-source to replace it.[11] Accordingly, Cali-

---

[11]The obviously anticompetitive nature of defendants' profit sharing agreement in a traditional market setting distinguishes it from the restraint in *California Dental Association*. Here, there is a long history of adjudging profit sharing agreements to be anticompetitive and of demonstrating the validity of that conclusion. The unique limits on price and quality advertising by dentists that were at issue in *California Dental Association* might have been thought by some to reduce incentives to compete over

fornia has carried its burden by demonstrating the existence of a great likelihood of anticompetitive effects.

Although California was not required to adduce empirical evidence of anticompetitive effects, given the nature of the restraint at issue in the case, the empirical evidence before us supports its contentions or is, at the least, of no substantial consequence. Defendants acknowledge diminished competitive behavior, such as discounting and advertising, during the period in which the profit sharing agreement was in effect. This, in all likelihood, resulted in at least some increase in, or some failure to reduce, the prices charged to the consumers.

---

price or quality, because without such advertising it would be difficult for a dentist to inform potential customers about his advantages over his competitors and, thus, lowering his prices or expending resources to improve his quality might simply have reduced his profits from existing customers. However, the Court reasoned that the nature of the market for "professional services" such as dental care was unique and that the circumstances made it difficult to compare services across providers and to verify price and service information, meaning that price and quality advertising might have been misleading, and misleading advertising itself poses dangers to competition. *See Cal. Dental Ass'n*, 526 U.S. at 771-72. Accordingly, the Court concluded, that because of the "professional context," it was not implausible that, as a theoretical matter, the restriction on price advertising had either a positive effect or no effect on competition. *See id.* at 774-75. The Court emphasized that theoretical claims of anticompetitive effects that are not evident or established in antitrust law must be carefully considered in order to justify shifting the burden to defendants to show some procompetitive effect. *See id.* at 775 n.12. Here, the subjective factors that the Court found were critical to the sale of professional services do not exist. Economic theory as well as a practical analysis of the factual circumstances make it clear that there is a high likelihood that the profit sharing agreement had anticompetitive effects. Unlike *California Dental Association*, there is a clear theoretical basis for concluding that a profit sharing agreement would have anticompetitive effects, and, again unlike *California Dental Association*, there is no plausible basis, theoretical or otherwise, for concluding that the profit sharing agreement had procompetitive effects, *see infra* section IV.2. Accordingly, the burden to demonstrate evidence of the restraints' procompetitive effects falls on defendants, who do not meet it in any way.

*See* Declaration of Thomas R. McCarthy, Backup to ex. 7A; Declaration of Steven Lawler at ¶ 8; Declaration of Carla Simpson ¶¶ 6-7; Declaration of Charles Ackerman ¶¶ 15-19. Defendants explain this change in behavior by attributing it to the lack of personnel created by the strike, rather than to the profit sharing agreement. However, their expert, who relied on this explanation, performed no regression or other statistical analyses, which are typical means of determining the effects of multiple variables, such as the labor dispute and the profit sharing agreement, on a single dependent variable, such as competitive behavior by defendants. *See, e.g., Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1183-84 & n. 9 (9th Cir. 2002). Instead, he simply looked at limited data from Albertsons and declared that Albertsons "did a lot of discounting during the strike" and that it increased its use of certain discounting methods. *See* Declaration of Thomas R. McCarthy ¶¶ 51-53. Because his analysis lacks a discussion of how much discounting Albertsons would have done absent the profit sharing agreement, it is beside the point. California's expert, who did perform regressions, asserted in his deposition that those regressions revealed that competition between defendants during the strike was harmed by the profit sharing agreement. He further noted that Vons raised its prices despite suffering a dramatic drop in demand for its products, exactly the opposite of the lower prices that are expected when demand drops in a competitive marketplace.[12]

---

[12]Defendants' evidence purporting to show that employees charged with pricing during the dispute did not know about the profit sharing agreement and took no action because of it, which was relied upon by the district court, also fails to provide support for their contentions. Their evidence on this point is both skeletal and somewhat dubious. Defendants do not come close to demonstrating that all employees with power over pricing were ignorant of the agreement or took no action because of it. *See, e.g.,* Declaration of Bryan Davis ¶ 3 (Albertsons employee describing himself as responsible only for the prices in a discreet category of groceries); Declaration of Carla Simpson ¶ 2 (Safeway employee describing herself as having responsibility only for implementing pricing established by another department). Moreover, early in the strike the Los Angeles Times published a front-page article revealing that the chains had agreed to share the

Given the obviously anticompetitive nature of defendants' profit sharing agreement, no empirical data about the effects of the agreement are necessary for "an enquiry meet for [this] case." Nonetheless, a review of the empirical evidence in the record only increases the certainty that defendants' agreement generated a great likelihood of anticompetitive effects, that it is implausible that such effects could be overcome or neutralized by the conduct of defendants or others during the term of the agreement, and that requiring a full rule of reason inquiry would be contrary to the efficient and effective implementation of our antitrust laws.

2.

Where, as here, a "great likelihood of anticompetitive effects can easily be ascertained," the burden of proof is shifted to the defendant to "to show empirical evidence of procompetitive effects." *Cal. Dental Ass'n*, 526 U.S. at 770, 775 n.12; XI Areeda & Hovenkamp ¶ 1914d(1) at 355 (when

---

financial burden of the strike. *See* Nancy Cleeland & Melinda Fulmer, *In Tactical Move, Union Pulls Pickets From Ralphs*, L.A. Times, Nov. 1, 2003, at A1. More important, it would defeat entirely the efficiency goals underlying the existence of per se, quick look, and "meet for the case" analysis if defendants could preclude a summary finding, and proceed to full rule of reason analysis, simply by asserting that the employees in charge of pricing did not know about the profit sharing. Such assertions are easy to make, while proving or disproving who knew what, and whether the knowledge of a particular individual had any effect on whether the company acted in a competitive manner, would require exactly the sort of onerous and costly production of evidence that summary review is meant to avoid. In any case, as noted above, the quick look inquiry is a probabilistic one: in order to place the burden on defendants to demonstrate that the agreement had a procompetitive effect, California need prove only that defendants' agreement to share profits created a great likelihood of anticompetitive effects. Accordingly, even if the anticompetitive effects had not come to pass because certain employees did not learn of the agreement or did not correctly calculate where the company's interests lay in light of the agreement, that fact would be immaterial to the result of our inquiry.

"the restraint is of such a character that an anticompetitive effect may be presumed," then "the only tolerance permitted to the defendant is to show" procompetitive effects). Procompetitive effects include efficiency gains, the development or improvement of products, and other benefits to consumers and society. *See* XI Areeda & Hovenkamp ¶ 1912c(2) at 320. In *California Dental Association*, for instance, the Supreme Court saw a plausible procompetitive justification for the dentist association's restrictions limiting price and quality advertising in the potential of such restrictions to improve consumer information by eliminating false and misleading advertising. *See* 526 U.S. at 771-72.

At this point comes defendants' actual and least justifiable contention. The supermarkets assert that conduct that serves to reduce the cost of labor serves a procompetitive purpose, such as may excuse otherwise anticompetitive behavior. They contend that the procompetitive benefit of their agreement is that it increased their chances of winning the labor dispute and reducing the wages and benefits they would be required to pay to their employees, which in turn would increase their ability to lower prices and compete more effectively with other companies. *See* Declaration of Thomas R. McCarthy ¶ 10. Defendants' proffered justification for their profit sharing arrangement is, in essence, a countervailing power defense that the restraint of trade is necessary in order to give them sufficient bargaining power to counteract the market power exercised by their striking workers and thereby to allow them to purchase their workers' labor at a lower price.

As California points out, however, the chain of contingencies linking defendants' exercise of bargaining power to reduced prices for consumer purchases renders any such procompetitive benefits of their profit sharing agreement purely speculative. Rule of reason examination of defendants' countervailing power defense is accordingly unnecessary. "Suffice it to say that the theoretical literature suggests that countervailing cartels seldom improve the welfare of consumers."

XII Hovencamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, ¶ 2015b at 158 (2d ed. 2000).

More important, driving down compensation to workers in this way is not a benefit to consumers cognizable under our laws as a "procompetitive" benefit. Defendants do not pretend that they agreed to bargain in such a way that there will be a greater overall amount of labor purchased, for example because the transaction costs to purchase each unit of labor are lower when the supermarkets work together. Defendants' argument for why their profit sharing agreement is procompetitive is instead, essentially, that it increases their bargaining power relative to striking workers in order to buy their labor at a lower price. In this way, the profit sharing arrangement resembles a cartel on the buyer side of the market.

The Supreme Court has made clear, however, that because antitrust law operates to correct all distortions of competition, it condemns market actors who distort competition, whether on the buyer side or seller side. *See Weyerhaeuser Co. v. Ross-Simmons Hardwood*, 549 U.S. 312, 322 (2007) ("Predatory-pricing and predatory-bidding claims are analytically similar. . . . This similarity results from the close theoretical connection between monopoly and monopsony."). Accordingly, the Court has long understood the Sherman Act to condemn buyer side cartels. *See, e.g., American Tobacco Co. v. United States*, 328 U.S. 781 (1946); *Mandeville Island Farms v. American Crystal Sugar Co.*, 334 U.S. 219 (1948); and certain exercises of single-firm buyer power. *See Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207 (1959). A central problem with allowing a countervailing power defense to justify buyer collusion is that such defense would be raised "in almost any case where the selling market is not perfectly competitive," such that all "[n]on-immune employers would claim the right to collude on wages because their employees are organized into unions and thus have significant power." XII Hovencamp ¶ 2015b at 156.

In any event, defendants' argument is wholly unpersuasive in light of our nation's labor laws and policies. It is a primary objective of these laws to protect the rights and interests of working persons, and to enable them to obtain a fair and decent wage through collective action.[13] Reducing workers' wages and benefits is hardly an objective that would justify a violation of our antitrust laws or constitute a benefit to the public so substantial as to overcome the deleterious consequences of anticompetitive conduct. There is no reason, even if we had the authority to do so, to set aside the ordinary principles governing antitrust law in order to unbalance the carefully developed legal structures relating to our laws governing collective bargaining; nor is there any reason or justification for assuming the function of increasing the economic power of employers to the disadvantage of their employees. To the extent that anticompetitive conduct is exempted from the application of our antitrust laws in order to facilitate the operation of labor/management processes, even the majority holds that it does not provide an escape device for the employers' conduct in this case. Defendants have not offered, much less demonstrated, any way in which their agreement generates procompetitive effects.

---

[13]"One of the important social advantages of competition mandated by the antitrust laws is that it rewards the most efficient producer and thus ensures the optimum use of our economic resources. This result, as Congress [has] recognized, is not achieved by creating a situation in which manufacturers compete on the basis of who pays the lowest wages." *United Mine Workers of Am. v. Pennington*, 381 U.S. 676, 724 (1965) (Goldberg, J., dissenting and concurring); *see also* 15 U.S.C. § 17 ("The labor of a human being is not a commodity or article of commerce."); *Polygram Holding, Inc. v. FTC*, 416 F.3d 29, 38 (D.C. Cir. 2005) ("A restraint cannot be justified solely on the ground that it increases the profitability of the enterprise . . . ."); *Law v. NCAA*, 134 F.3d 1010, 1023 (10th Cir. 1998) ("[M]ere profitability or cost savings have not qualified as a defense under the antitrust laws."). Depressing wages is not of societal benefit; it simply harms working people and their families, a significant part of the group that has come to be known as "the middle class," and which is experiencing enough economic travail without the added unlawful actions of those conspiring to violate the antitrust laws.

It is little wonder that the majority expressly declines to address the "grocers['] argu[ment] that the RSP has procompetitive benefits in the form of lower prices for consumers as a result of the grocers' ability to negotiate a more favorable contract on labor costs." Maj. Op. at 9313 n.17. Were defendants' proffered justification accepted as a ground for requiring full-blown rule of reason inquiry, colluding firms could evade quick look condemnation, without in any way increasing real efficiency or reducing costs to the consumer. Firms like the supermarkets that participate in markets for both buying (labor) and selling (groceries), and engage in a restraint of trade that has distorting effects in both, cannot avoid quick look review of anticompetitive conduct simply by positing that they could conceivably pass on to consumers in the selling market any private gains such firms may achieve by restraining competition in the buying market. Allowing them to do so would lead to the absurd result that conduct which restrains *more* competition, in the sense that it distorts competition in both the buying and selling markets, would be subject to less demanding scrutiny than would be a comparable restraint that distorted just one market.

3.

Defendants have put forward no plausible procompetitive effects to overcome or neutralize the great likelihood of anticompetitive effects that would result from the implementation of their profit sharing agreement. That likelihood is evident from a plain reading of the agreement's terms, an examination of the ample case law regarding profit sharing agreements, a rudimentary knowledge of economics, and an analysis of the "circumstances, details, and logic" of the agreement. In the absence of a procompetitive justification that outweighs the likelihood of substantial anticompetitive effects, I conclude with confidence and even with certainty that the profit sharing agreement violates § 1 of the Sherman Act. I also conclude with the same measure of confidence and certainty that denying California the injunction to which it is entitled, simply

because the parties did not engage in an extremely costly, burdensome, and utterly unnecessary battle of economic experts under rule of reason review, is contrary to the fundamental policies underlying our antitrust law, and encourages future antitrust violations by these defendants and others who may seek to suppress the rights of their employees.

Accordingly, I dissent in part.